UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RONALD DAVIDSON,

                Plaintiff           YIN

-vs-                                     DECLARATION

                                         **Docket No: 03-CV-0121**

UDAY DESAI, et al.,

                Defendants.

_____

       **Cheng Yin, M.D.** declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true and correct:

    1.  I am a medical doctor licenced to practice medicine in the State of New York, and was formerly employed by the New York State Department of Correctional Services ("DOCS"). At all times relevant to this lawsuit, I was employed by DOCS as a physician at the Elmira Correctional Facility ("Elmira").

    2.  I make this declaration in support of the defendants' motion for summary judgment based upon my personal knowledge and review of documents pertaining to Plaintiff's incarceration by DOCS.

    3.  I am informed that the Plaintiff in this action alleges that I was deliberately indifferent to his medical needs. Specifically, the plaintiff claims that:

        a.      on or about November 27, 1999 I refused to return the plaintiff to the Strong Memorial Center (referred to by the plaintiff as "University of Rochester Medical Center") to be seen by a neurosurgeon there or refer him to see another neurosurgeon (See Complaint ¶¶ 6 - 11);

b.     on or about December 16, 1999 I discharged the plaintiff and sent him back to his cell block despite his being in pain from an infection he developed following a discogram (See Complaint ¶¶ 6 to 12);

c.     following this discharge, I required the plaintiff to walk to get his medication and refused to have plaintiff's pain medicine brought to him (See Complaint ¶¶ 13 to 14);

d.     following this discharge, I reduced plaintiff's pain medication (See Complaint ¶ 14);

e.     I approved of Nurse Practitioner Herman Fowler's cancellation of plaintiff's shoulder surgery which was scheduled for December 15, 2000 (See Complaint ¶¶ 84 to 86);

f.     I denied him access to a pain clinic (See Complaint ¶¶ 36 to 48);

g.     I refused to provide plaintiff with allergy shots and sanctioned the alleged refusal of Nurse Administrator Marijon Hopkins, to give the plaintiff proper allergy serum (See Complaint ¶¶ 101 to 115);

h.     I refused plaintiff's request to be housed in the infirmary to avoid pollen, dust and second-hand smoke (See Complaint ¶¶ 141, 143, 158; and 168 to 179);

i.     I denied the plaintiff's right to privacy by requiring that inmates report to sick call two at a time (See Complaint ¶¶ 180 to 191)

j.     The plaintiff was not happy with the corrective lenses he was provided and I refused to allow the plaintiff to obtain corrective lenses from an outside source (See Complaint ¶¶ 193 to 202);

k.     I refused to provide the plaintiff with a low fat/low salt kosher diet, which, he alleges, caused elevated blood pressure (See Complaint ¶¶ 203 to 215);

l.     I required the plaintiff to sign a "consent form" in order to obtain specialized medical care (See Complaint ¶¶ 237 to 242);

m.     I deprived the plaintiff of sick calls when he entered them into the sick call box (See Complaint ¶¶ 250 - 253); and

n.     I did not provide him with copies of his post treatment plan (See Complaint ¶¶ 254 - 260).

I deny that I was deliberately indifferent to any of the plaintiff's medical needs, and will address

each allegation in turn, as follows.

    4.   With regard to the plaintiff's problems following his discogram, Mr. Davidson presented

with a fever and back pain following the discogram and barium meal study on November 26,

1999.   CBC and blood culture were sent out and he was treated with IV antibiotics (vancomycin/

Gentamycin).   When the culture results were obtained, the antibiotics were changed to IV

Rocephine and later to IM Rocepine, based on the my medical judgment that these medicines

would be more effective on the infection.   He remained on these medications until December 13,

1999.

    5.   On November 29, 1999, an emergency CT scan of the plaintiff's spine was performed.

No discitis or abscess was noted.   In the absence of discitis or abscess, surgical intervention is not

indicated, as no surgical procedure would be able to change the course of the plaintiff's disease.

No neurosurgeon would recklessly do any surgical procedure on him at that moment and there

was therefore no need to send the plaintiff to a neurosurgeon.   The plaintiff responded well to the

treatment he was given at the Elmira infirmary and he was afebrile for two weeks as of December

16, 1999.  By the time that the plaintiff was discharged to his cell on December 16, his back pain

was also improved, he had no difficulty in ambulation, and it had been twenty days since the

onset of his septicemia.

    6.   Prior to his discharged from the infirmary, on December 16, a request for an emergency

Neurosurgical consultation at Strong Memorial was submitted by me, and the plaintiff was

originally scheduled to be seen at Strong December 11.   However this was not carried out until

January 4, 2000.  At the request of that consultant, he was seen by another consultant on January

10, 2000.  I had no role in the scheduling or postponement of these appointments, and the

scheduling or postponement was not in my control.

7.   The plaintiff alleges that there were neurosurgeons that practice in Elmira who could have seen him, and mentions a Dr. Kung.  Even if I thought that the plaintiff should have been seen by a neurosurgeon, and I did not, Dr. Kung was not a consultant for Wexford Health Services, who was then contracted with DOCS to provide such services.

8.   Following his discharge from the infirmary, the plaintiff continued to received his pain medication; was provided a heating pad; his temperature was checked twice a day; and he was supposed to have bed rest in his cell for two weeks.

9.   I discharged the plaintiff to his cell as it was my medical opinion that he could was no longer in need of being confined to the infirmary and was healthy enough to be sent back to his cell, with the appropriate restrictions.  At that time I prescribed the level of medication I thought appropriate to control his pain.  Although he still took pain medication regularly, there was no reason to keep him in the infirmary indefinitely.

10.   Five days after his discharge from our infirmary, on December 21, 1999, Mr. Davidson complained of severe pain and having difficulty in ambulation.  In response I called his block officer to verify the complaint, and asked him about the plaintiff's condition. The officer told me "He is doing fine.  Looks normal.  Goes to recreation and Law Library".  He also states that he "Does not look in any pain".  However, the officer did not tell me exactly how many times he went to recreation in that five days period.

11.   With regard to the plaintiff's allegation that I approved of Nurse Practitioner Herman Fowler's cancellation of plaintiff's shoulder surgery, which was scheduled for December 15, 2000, this is in error.  As far as I know, his shoulder surgery was cancelled because this specific orthopedist who was to perform the surgery, was no longer connected to Wexford.  Mr. Davidson

was later seen by another orthopedist, Dr. Kaempffe.  Dr. Kaempffe opined that surgery would

not be helpful to Mr. Davidson's shoulder problem and recommended a conservative approach.

12.   As to the plaintiff's allegations regarding his access to a pain clinic, our request for a

referral to a Pain Clinic was temporarily denied, pending further evaluation by a neurosurgeon or

orthopedic surgeon.  Mr. Davidson was subsequently seen at a Pain Clinic following an

evaluation by Dr. King, a neurosurgeon at SUNY, who found no indication for surgery and

advised referral to a Pain Clinic.  However, Mr. Davidson was not satisfied with this outcome

and seemed to feel that Dr. King's action were in response to Davidson's previous litigation with

SUNY.

13.   With regard to plaintiff's allegations regarding the delivery of allergy serum, I had no

knowledge as to that issue.

14.   Regarding Mr. Davidson's allegation that he should have been housed in the infirmary

to avoid pollen, dust and second-hand smoke, the infirmary is intended for inmates that are in

need of constant medical care and attention.  The infirmary is intended to house otherwise

healthy inmates who are not in need of immediate medical care.

15.   Further, as a physician at Elmira I had no role or ability to determine where in the

Facility an inmate is housed, unless he is need of immediate medical care.  While I can

recommend a location for an inmate to be housed, the final decision was up to the security staff.

16.   It should also be noted that DOCS policy has prohibited the smoking of tobacco

products indoors, by both inmates and staff, since 2001.  However, as a physician at Elmira, I had

no role in enforcing inmate disciplinary rules, or staff disciplinary rules, including the no

smoking rule.

17.   With regard to the plaintiff's allegation regarding violations of privacy at sick call, sick

call was conducted by nurses and I was not present at sick calls.  Also, as a physician at Elmira, I

had no administrative role and could not determine the process for sick call.

18.   I have no knowledge of any of the plaintiff's alleged problems obtaining eyeglasses.

Further, as a physician I do not have any control as to where or how DOCS arranges to provide

corrective lenses for inmates.  Since I am not an optometrist, I do not prescribe corrective lenses.

19.   With regard to the plaintiff's allegation that I refused to provide him with a low fat/low

salt kosher diet, Elmira did provide a low fat/low salt diet, which I understand was provided to

the plaintiff.  I have no reason to believe that the low fat/low salt diet was anything but low in fat

and low in salt.  As a physician I did not have any role in determining the contents of the kosher

diet.

20.   With regard to the plaintiff's allegations regarding the recommendations of specialist

consultants, it should be noted that when a  specialist consultant recommends a particular

medication, test or procedure, that is not an "order".   Whether a particular procedure or test is

performed or treatment provided is not at the discretion of the specialist consultant.  Only an

inmate's DOCS provider can "order" tests, procedures, and treatment, and many procedures and

tests must be approved at the DOCS Central Office in Albany.  As an inmate's primary medical

provider, it is up to me whether or not to take a specialist consultant's recommendations.

21.   I was not aware that Mr. Davidson alleged that his requests for sick call were ignored,

prior to the filing of this action.  Again, since I had no administrative role, I could not determine

the process for sick call.  As it is, I can only say that Mr. Davidson was seen regularly by medical

staff, both at sick call, regularly scheduled appointments, and by specialist consultants.

22.   With regard to the plaintiff's allegations that he was denied access to his post treatment

plan, the post treatment plans issued by hospitals are for the use of the facility medical staff in

treating the plaintiff after his release from the hospital.  Generally, patients (whether inside or outside of prisons) do not have an absolute right to access to their medical records.

23.  Finally, I can state that, it is my opinion, within a reasonable degree of medical certainty, that the medical care which I provided the plaintiff was consistent with the prevailing standards of medical care.

24.  Accordingly, I respectfully request that this Honorable Court grant this Motion for Summary Judgment and dismiss the plaintiff's Complaint.

DATED:      October _7_, 2009

                                                  ___/s/ Cheng Yin_____
                                                  Cheng Yin, M.D.