UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONALD DAVIDSON,

               Plaintiff,        **STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF**
   -vs-                                **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

UDAY DESAI, et al.,

                                                   **Docket No: 03-CV-0121**

               Defendants.
_____

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York, defendants submit this statement of undisputed material facts in support of their motion for summary judgment. The only facts material to this motion are not in dispute, and are as follows:

      1. This action was commenced by the filing of the Complaint on February 18, 2003 (Complaint page 5, ¶ 71, Doc. No. 1).

      2.  The plaintiff in this matter is an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"). (Page 10 of Plaintiff's Deposition, attached to the declaration of George Michael Zimmermann as Exhibit "A").  He is currently housed at Shawangunk Correction Facility. Davidson Dep. Pg. 1.

      3.  The plaintiff was housed at Elmira Correction Facility from June of 1998 until December 24th 2004. Davidson Dep. Pg. 1.

      4.  DOCS maintains a grievance program for inmates to make formal complaints regarding the conditions at their Facilities, which provides for an appeals process (¶¶ 4 - 6 of the

declaration of Thomas Eagen submitted herewith).

5.  Plaintiff maintains that he spoke to defendant Thomas Eagen, then Director of the Inmate Grievance Program, on August 20, 1999 (Complaint page 5, ¶ 71; and Eagen dec. ¶¶ 1 and 4).

6.  On or about November 24, 1999, underwent a discogram at Strong Memorial Hospital (Complaint page 5, ¶ 1; Davidson Dep. Pg. 19; ¶ 4 of the declaration of Cheng Yin, M.D., submitted herewith; and Bates No. 0065 of the certified medical records of the Plaintiff, Ronald Davidson, attached as Exhibit "B" of the Zimmermann dec.).

7.  Following the discogram, the plaintiff developed a fever and back pain (Complaint page 5, ¶ 3; Davidson Dep. Pg. 21 - 22; Yin dec. ¶ 4; and Plaintiff's medical records Bates No. 0575).

8.  The plaintiff was diagnosed with an infection and treated by physicians Cheng Yin and Uday Desai, which treatment included blood tests, antibiotics, and a CT scan (Davidson Dep. Pg. 31; Yin dec. ¶ 4 - 9; ¶ 5 - 6 of the declaration of Uday Desai, M.D., submitted herewith; amd Plaintiff's medical records Bates No. 0539 - 0556).

9.  The plaintiff was treated with two different courses of antibiotics until December 13, 1999, and kept in the Elmira infirmary until December 16, 1999, at which time he had been without a fever for two weeks, was able to walk with out difficulty and there had been no indication of discitis or abscess in the CT scan (Yin dec. ¶¶ 4 - 5; Desai dec. ¶ 5; and Plaintiff's medical records Bates No. 0068). He was discharged based on the doctors' medical opinion that he was healthy enough to return to general population (Yin dec. ¶ 9; and Desai dec. ¶¶ 5 - 6).

10.  Following his discharge from the infirmary, the plaintiff received pain medication, and a heating pad; his temperature was checked twice a day; and he was ordered to have bed rest

in his cell for two weeks (<u>Yin</u> dec. ¶ 8).  The amount of pain medication was decreased from the amount he had received in the infirmary (<u>Desai</u> dec. ¶ 5).

11. Upon his discharge from the infirmary, a request for an emergency Neurosurgical consultation with Dr. Goyal at Strong Memorial was submitted for the plaintiff, which occurred on January 4, 2000 (<u>Yin</u> dec. ¶ 6; and Plaintiff's medical records Bates No. 0591).  At the request of that consultant, he was seen by another consultant on January 10, 2000.  (<u>Yin</u> *Id.*; <u>Desai</u> dec. ¶ 8; and Plaintiff's medical records Bates No. 0600).

12. The plaintiff was seen by outside consultants for his back several times in February and March of 2000 (Plaintiff's medical records Bates No. 0623, 0630, 0640, 0649, 0654, 0656, 0920, 0936, 0940 - 0941, 0937, 1172, 1174) as well as given physical therapy (Plaintiff's medical records Bates No. 0647 - 0648)

13. On December 15, 2000, the plaintiff was scheduled to go in for shoulder surgery, to be performed by Dr. Mosher, an orthopedist (<u>Yin</u> dec. ¶ 11; ¶ 5 of the declaration of Heman Fowler submitted herewith; and Plaintiff's medical records Bates No. 0169 ).  At the time the appointment was scheduled, Dr. Mosher had a relationship with Wexford Health Services, a firm that had contracted with DOCS to provide medical services (<u>Yin</u> dec. ¶¶ 7 and 11).  Dr. Mosher cancelled the surgery, when he discontinued his relationship with Wexford (<u>Yin</u> dec. ¶ 11; <u>Desai</u> dec. ¶ 7; <u>Fowler</u> dec. ¶ 4 - 5; and Plaintiff's medical records Bates No. 0175, 0906 - 0907, 0949, 0950).

14. Plaintiff maintains that this was done by either defendants Bennet or Fowler (<u>Complaint</u> ¶¶ 17- 18, and 84 - 86; and <u>Davidson Dep.</u> Pages 121 - 122)

15. Mr. Davidson was later seen by another orthopedist, Dr. Kaempffe, who was of the opinion that surgery was not appropriate and recommended a conservative approach (<u>Yin</u> dec.

*Id.*; Fowler dec. ¶ 6; and Plaintiff's medical records Bates No. 0907 - 0909).

16. Plaintiff believes that on May 24, 2001, an unnamed Corrections Officer and defendant Sheryl Graubard, the Inmate Grievance Program Coordinator at the Elmira, searched his cell (Complaint ¶¶ 65 - 66; and Davidson Dep. Pg. 115). Ms. Graubard denies that she did so (¶ 8 of the declaration of Sheryl English [ne Graubard] submitted herewith).

17. The plaintiff was never prevented from filing any law suit as a result of the alleged search (Davidson Dep. Pg. 120).

18. In July of 2001, Dr. Yin tried to refer the plaintiff to a pain clinic, which referral was initially denied (Yin dec. ¶ 12; and Plaintiff's medical records Bates No. 1027). Following an evaluation by a neurosurgeon plaintiff was referred to a Pain Clinic (Yin dec. *Id.*; and Plaintiff's medical records Bates No. 1040 - 1041; 1082 - 1085). The Plaintiff was seen at a Pain Clinic (Yin dec. *Id.*).

19. On January 24, 2002, the Plaintiff was given a pulmonary function test the results of which were normal (Plaintiff's medical records Bates Nos. 1108 - 1111).

20. Plaintiff maintains that he spoke to defendant Eagen, on February 15, 2002, regarding his allegations that his grievances were being intentionally lost and ignored by Ms. Graubard (Complaint page 5, ¶¶ 34, 71; and Eagen dec. ¶ 4).

21. There is no evidence that either Ms. Graubard or Mr. Eagan intentionally ignored plaintiff's grievances and the plaintiff managed to file grievances on a regular basis (Eagen dec. ¶ 7, 8 and 9; and English dec. ¶¶ 6 and 7).

22. On March 19, 2002, the plaintiff was seen by an outside specialist named Dr. Sikorski for his allergies, who recommended that the Plaintiff be given allergy injections and made arrangements for those injections to be prepared (Plaintiff's medical records Bates No.

1127, 1128, 1132 - 1139, and 1152 - 1158).

23. March 25, 2002, the plaintiff's was seen by another outside specialist named Dr. Sivak, who suggested a "methacholine challenge test" (¶ 10 of the declaration of Wesley Canfield submitted herewith; and Plaintiff's medical records Bates No. 1142). It was decided that it made more sense to await the plaintiff's response to the allergy injections, to see if his pulmonary symptoms improved (Canfield dec. *Id.*; and Plaintiff's medical records Bates No. 0284).

24. The plaintiff initially refused his first allergy shot on April 10, 2002 (Complaint ¶ 104; and Plaintiff's medical records Bates No. 0288) On May 7, 2002, the Plaintiff was again scheduled to begin allergy shots (Canfield dec. ¶ 5; Desai dec. ¶ 9; ¶ 3 of the declaration of Marijon Hopkins submitted herewith; and Plaintiff's medical records Bates Nos. 0268). The Plaintiff refused the shot since it had not been drawn in his presence and insisted that a nurse drew up the allergy serum intended for another inmate (Complaint ¶ 105 and 107; Davidson Dep. Pg. 129 - 131; Canfield dec. *Id.*; and Plaintiff's medical records Bates No. 0295). On May 14 he again refused his allergy shot (Complaint ¶ 107; Canfield dec. *Id.;* Hopkins dec. ¶ 3; and Plaintiff's medical records Bates No. 0297).

25. The allergy serum had a limited life span and became outdated and unusable (Canfield dec. ¶ 10). The test recommended by Dr. Sivak was only useful if the plaintiff did not respond to the serum injections, and he was therefore not provided with the test as it was no longer medically indicated (*Id.*).

26. In the following two years Mr. Davidson's pulmonary symptoms remained the same (Canfield dec. ¶ 12).

27. Following an outside visit, the plaintiff was not usually provided with the post

treatment plan issued by the outside medical provider, as this document is for the use of the DOCS medical providers post treatment plan (Yin dec. ¶ 22; Desai dec. ¶ 19; Canfield dec. ¶ 19; Rabideau dec. ¶ 5; and Trabout dec. ¶ 18).  Individuals do not have an absolute right to their medical records (*Id.*).

28.   The Plaintiff objects to the manner in which sick calls were performed at Elmira, although they are no longer performed in that manner (Complaint ¶¶ 180 - 191).  Specifically he maintains that his privacy was violated by a process whereby inmates reported to sick call two at a time (See Complaint ¶¶ 180 to 191; Davidson Dep. Pg. 164 - 165).

29.   Plaintiff asked to be housed in the infirmary although this was not an appropriate setting for the plaintiff (Complaint ¶¶ 141, 143, 158; Davidson Dep. Pg. 141; Yin dec. ¶ 14, Desai dec. ¶ 11; Canfield dec. ¶ 13; and Trabout dec. ¶ 11).

30.   The Plaintiff was provided with a low fat low salt Kosher diet (Yin dec. ¶ 19; Desai dec. ¶ 16).

31.   Plaintiff alleges that his requests for sick call were ignored.  However, he was seen several times a month by medical staff, both at sick call, regularly scheduled appointments, and by specialist consultants. (Canfield dec. ¶ 18; Desai dec. ¶ 18; Rabideau dec. ¶ 4; and plaintiff's medical records Bates Nos. 0001 - 1216).

32.   DOCS inmates are required to sign Specialty Health Trip Forms, when they are scheduled to be sent outside of the prison see specialist consultants, which states that the inmate may refuse medical treatment.  The form only requires that they agree to travel to the location where the appointment is to be held (Canfield dec. ¶ 17).

33.   When DOCS inmates are seen by outside medical consultants, these consultants frequently make recommendations for treatment (Yin dec. ¶ 20; Desai dec. ¶ 17; and Canfield

dec. ¶ 9). These are not "orders", and only a DOCS provider can "order" tests, procedures, and treatment, many of which must be approved at the DOCS Central Office in Albany (*Id.*; and Trabout dec. ¶ 10).

34. DOCS has prohibited indoor smoking since 2001 (Yin dec. ¶ 16; Desai dec. ¶ 13; Canfield dec. ¶ 15; and Trabout dec. ¶ 13).

35. As Regional Medical Director defendant Marshall Trabout did not directly provide medical services to the Plaintiff or any other inmate (¶¶ 6 - 9 of the declaration of Marshall Trabout M.D., submitted herewith). The Regional Medical Director has no role in determining inmate housing (Trabout dec. ¶ 12).

36. The Facility Medical Director does not control inmate housing, enforce disciplinary rules (such as the ban on indoor smoking), or control the provision of eye glasses to inmates (Canfield dec. ¶ 14 - 16).

37. Treating physicians such as doctors Yin and Desai do not control inmate housing, enforce disciplinary rules (such as the ban on indoor smoking), determine the process for sick call, or control the provision of eye glasses to inmates (Yin dec. ¶ 14 - 18, and 21; Desai dec. ¶ 12 - 15).

38. Nurse Practitioners at Elmira have no administrative role and could not determine the process for sick call (Fowler dec. ¶ 8).

39. Nurse Administrators are responsible for maintaining the quality of nursing practice within the facility, not the provision of medical care (Hopkins dec. ¶ 5). Nurse Administrators do not control inmate housing or enforce disciplinary rules (such as the ban on indoor smoking) (Hopkins dec. ¶¶ 6 - 7).

40. As DNA Coordinator, defendant Anne Rabideau was not present at sick calls and

did not coordinate or administer them (¶ 3 of the declaration of Anne Rabideau submitted herewith).

Dated:	Buffalo, New York
	August 25, 2009

>	ANDREW M. CUOMO
>	Attorney General of the State of New York
>	Attorney for Defendants
>	BY:
>
>
>	/s/ George Michael Zimmermann
>	GEORGE MICHAEL ZIMMERMANN
>	Assistant Attorney General, of Counsel
>	Main Place Tower, Suite 300A
>	350 Main Street
>	Buffalo, New York 14202
>	(716) 853-8444
>	George.Zimmerman@oag.state.ny.us

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2010, I electronically filed the foregoing Statement of Undisputed Facts with the Clerk of the District Court using its CM/ECF system, who would then electronically notify the following CM/ECF participants in this case:

**none**

And, I hereby certify that on November 18, 2009, I mailed the foregoing, by the United States Postal Service, to the following non-CM/ECF participants:

Ronald Davidson 76-A-1166
Shawangunk Correctional Facility
750 Prison Road
P.O. Box 700
Wallkill, NY 12589

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Defendants
BY:

/s/ George Michael Zimmermann
GEORGE MICHAEL ZIMMERMANN
Assistant Attorney General of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
(716) 853-8444
George.Zimmermann@ag.ny.gov