UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RONALD DAVIDSON,

                    Plaintiff,

         v.                                          **DECISION AND ORDER**
                                                     03-CV-121S
UDAY K. DESAI, M.D.,
CHENG YIN, M.D.,
HEMAN FOWLER, N.P.,
FLOYD BENNETT,
CALVIN WEST,
MARIJON HOPKINS, R.N.,
SHERYL GRAUBARD,
DANA SMITH, and
WESLEY CANFIELD, M.D.,

                    Defendants.

## I.    INTRODUCTION

Plaintiff Ronald Davidson seeks money damages under 42 U.S.C. § 1983 from

Defendants, all of whom are current or former employees of the New York Department of

Corrections and Community Services ("DOCCS"), for their alleged violations of his First

and Eighth Amendment rights while he was an inmate at the Elmira Correctional Facility.

In particular, Davidson alleges that Defendants retaliated against him for filing grievances

and were deliberately indifferent to his serious medical needs.

After pretrial litigation through the summary judgment stage, three of Davidson's

claims remained for trial.   First, Davidson claimed that several defendants were

deliberately indifferent to his shoulder condition and canceled his shoulder surgery in

December 2000 in retaliation for him filing grievances, in violation of his First and Eighth

Amendment rights.   Second, Davidson claimed that several defendants were

deliberately indifferent to his back pain, in violation of his Eighth Amendment rights. And

third, Davidson claimed that several defendants were deliberately indifferent to his allergy

and asthma conditions by exposing him to second-hand smoke, in violation of his Eighth

Amendment rights.

On June 19, 2017, this Court commenced a 5-day bench trial,[1] which ended on

June 23, 2017.[2] (Docket Nos. 288, 289, 291, 292, 293.) Having considered the trial

evidence, the witnesses' credibility, and the parties' post-trial submissions, this Court now

makes the following findings of fact and conclusions of law on each of Davidson's claims,

as required by Rule 52 (a) of the Federal Rules of Civil Procedure.[3] For the following

reasons, this Court finds that Davidson has failed to prove any violation of his federal

constitutional rights.

## II.    BACKGROUND

### A. Procedural History

Davidson commenced this action pro se on February 18, 2003, alleging numerous

---

[1] Davidson, a state parolee, elected to proceed via bench trial, despite his jury demand. But Davidson was unable to secure permission from state parole authorities to travel to Buffalo for trial. (Docket No. 284.) He therefore attempted to revive his jury demand, apparently believing that his presence could be compelled for a jury trial. (Id.) Because Davidson's presence could not be compelled for either a bench trial or a jury trial, this Court denied Davidson's late request. (Id.)

[2] The 5-day bench trial has been transcribed into 728 consecutively-numbered pages spanning five volumes at docket numbers 296-300. To avoid confusion, this Court cites the transcript page number ("Tr. at __"), rather than the page number of each individual volume generated by the electronic filing system. The trial transcript also includes Court Exhibit 1 (Docket No. 317), which is the transcript of Defendant Yin's preserved trial testimony that was presented at trial via recording. (Tr. at 367-368, 373.)

[3] This Court's findings concern only those issues that are material to the resolution of the parties' claims. See Immigration & Naturalization Serv. v. Bagamasbad, 429 U.S. 24, 25, 97 S. Ct. 200, 201, 50 L. Ed. 2d 190 (1976) ("courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach"); Rule 52 Advisory Committee Notes (1946 Amendment) ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts").

causes of action against numerous defendants. (Docket No. 1.) After an extended period of discovery and litigation related thereto, Defendants moved for summary judgment on November 18, 2009. (Docket No. 106.) Briefing on that motion concluded on February 1, 2011, shortly after which the Honorable Leslie G. Foschio, United States Magistrate Judge, filed a thorough Report and Recommendation recommending that Defendants' motion be granted in part and denied in part. (Docket No. 140.) This Court accepted Judge Foschio's Report and Recommendation over the parties' objections on August 25, 2011. (Docket No. 148.)

The three claims identified above are the only ones that survived summary judgment. On February 9, 2012, this Court granted Davidson's request for assignment of counsel[4] and appointed Michael A. Brady, Esq.,[5] to represent him. (Docket No. 156.) After additional litigation upon the entry of counsel into the case, this Court permitted limited amendment of the complaint. (Docket No. 211.) Specifically, this Court permitted Davidson to plead additional facts to clarify his three pending claims, but denied his requests to add new claims and to extend the time period of his pending claims. (Id.) Davidson thereafter filed an amended complaint on November 5, 2014. (Docket No. 212.)

After another short period of discovery and pretrial motion practice, this case became trial-ready. In the weeks before trial, Davidson, who by then had been released

---

4 Davidson's previous motions to appoint counsel were denied.

5 This Court extends its sincere gratitude to Michael Brady and Daniel Brady of Hagerty & Brady for their consistent commitment to ensuring equal access to justice for all by accepting this and other pro bono case assignments in this district.

to parole from DOCCS' custody, could not obtain permission from his state parole officer to travel to Buffalo for trial. (Docket No. 281.) He also could not secure free lodging in Buffalo. (Id.) He therefore moved for orders from this Court requiring that he be allowed to travel to Buffalo and that his lodging and sustenance be paid from the court's District Court Fund. (Id.) Finding that it lacked authority to grant either request, this Court denied Davidson's motion.[6] (Docket No. 284.)

This Court did, however, arrange for Davidson to testify via videoconference from a courthouse in the Southern District of New York in the company of one of his lawyers, and to thereafter listen to the proceedings by telephone.[7] (Docket No. 287; Tr. at 236-237.) To further accommodate Davidson, and to facilitate his active participation in the trial, this Court also took frequent breaks to allow Davidson and his attorneys to consult privately over the telephone, including breaks before and after direct and cross-examination of witnesses. (See, e.g., Docket No. 287; Tr. at 236-237.) Davidson was thus afforded every available opportunity to meaningfully participate in the trial.

---

6 Davidson renewed his motion immediately before opening statements and requested an adjournment of the trial to allow for a hearing. (Tr. at 5-6; see also Tr. at 336-337.) Relying on Davidson v. Riley, a case that he litigated pro se, Davidson argued that a hearing was necessary to determine whether state parole authorities should be compelled to permit him to travel to Buffalo. 44 F.3d 1118 (2d Cir. 2009). This Court considered Riley and found it inapposite. (Tr. at 6.) In Riley, the Second Circuit found that the district judge erred by deferring to DOCCS on the question of whether Davidson should be handcuffed and shackled at trial, and instead should have held a hearing and made his own independent judgment concerning the need for the restraints. Riley, 44 F.3d at 1122-1127. Presumably Davidson read Riley as requiring a hearing on the theory that this Court was impermissibly deferring to state parole officials on an issue reserved to the court: whether Davidson should be permitted to travel to Buffalo for trial. Not only is Riley entirely distinguishable on the facts and issues presented, but Davidson's stretched analogy itself limps because here the question of whether Davidson should be permitted to travel was not reserved to this Court, but rather, was exclusively reserved to state parole officials. In other words, unlike in Riley, this Court had no independent obligation (or authority) to resolve the issue. Consequently, Riley had no application and no hearing was required.

7 Due to logistical and security concerns, including that Davidson's lawyers were not available to be physically present with him in the Southern District of New York on each trial day after he testified, it was not feasible for Davidson to participate in the entire trial by videoconference.

4

Trial began on June 19, 2017, and lasted five days.   (Docket Nos. 288, 289, 291, 292, 293.)   Davidson presented two witnesses, including himself.   Defendants presented seven witnesses.   At the conclusion of trial, this Court directed the parties to submit proposed findings of fact and conclusions of law, which, after extensions of time to do so, they filed on December 20, 2017.   (Docket Nos. 311, 313, 315, 316.)   This Court thereafter took the matter under advisement without further proceedings.

## B. Davidson's Claims

As previously noted, the bench trial involved three claims arising out of Davidson's causes of action.

Davidson's first claim—contained in his second cause of action—alleges that Defendants Desai, Yin, and Fowler were deliberately indifferent to his serious shoulder condition, which required surgery.   He maintains that they canceled his December 2000 shoulder surgery and then refused to re-schedule it, instead directing that he be treated more conservatively, which Davidson maintains resulted in further deterioration of his shoulder condition and additional pain and suffering.   Davidson's first claim also includes his related tenth cause of action, which alleges that Defendants Yin, Bennett, West, Hopkins, [8] and Canfield canceled his shoulder surgery in retaliation for him filing grievances.

Davidson's second claim—also contained in his second cause of action—alleges that Defendants Desai, Yin, and Fowler were deliberately indifferent to his serious back pain by allowing his pain medication prescription to lapse and by denying him pain

---

[8] Davidson consented to Hopkins' dismissal for lack of proof at the conclusion of his testimony.   (Tr. at 236.)

medication on certain dates, which caused Davidson to experience back pain and withdrawal symptoms.

Davidson's third claim—contained in his fifth cause of action—alleges that Defendants Desai, Yin, Bennett, West, Graubard, [9] and Smith were deliberately indifferent to his serious allergy and asthma conditions by exposing him to second-hand smoke at Elmira.

### C. General Legal Principles

#### 1. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); see also Woodford v. Ngo, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); Hargrove v. Riley, No. 04–CV–4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."

---

9 Davidson consented to Graubard's (nee English) dismissal for lack of proof at the conclusion of his testimony.  (Tr. at 236.)

Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).

Here, the parties stipulated that Davidson properly exhausted his administrative remedies for each of his claims.   (Tr. at 37.)

### 2. Statute of Limitations

The statute of limitations for a § 1983 claim is "that which the State provides for personal-injury torts."   Wallace v. Kato, 549 U.S. 384, 387, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007).   In New York, that statute of limitations is three years.   See Berman v. Perez, No. 17-CV-2757 (JGK), 2018 WL 565269, at *2 (S.D.N.Y. Jan. 24, 2018) (citing Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013), in turn citing N.Y. C.P.L.R. § 214).

Davidson filed his complaint on February 18, 2003.   (Docket No. 1.) Consequently, any claims pre-dating February 18, 2000 are time-barred, as Davidson concedes.   (Tr. at 722.)

### 3. Burden of Proof

In a general civil suit such as this one, the plaintiff must prove his or her claim by a preponderance of the evidence.   See Addington v. Texas, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); see also Brown v. Lindsay, Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010) ("In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence.").   "'To establish a fact by a preponderance of the evidence means to prove that the fact is more likely than not true.'"   Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997) (quoting 4 L. Sand et al., Modern Federal Jury Instructions ¶ 73.01, at 73-4 (1997)).   If the evidence is evenly balanced, the plaintiff does not satisfy the burden of proof.   See Kosakow v.

New Rochelle Radiology Assocs., 274 F.3d 706, 731 (2d Cir. 2001) ("where the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced").

## III.    FINDINGS OF FACT[10]

### A.  Operation of the Elmira Medical Department

At all times relevant, Davidson was an inmate in DOCCS' custody at the Elmira Correctional Facility in Elmira, N.Y.   He arrived on June 8, 1999, and stayed for about four and half years, until his transfer to the Auburn Correctional Facility in December 2004. (Tr. at 42, 134, 175, 527, 648; Defendants' Exhibits B-26, B-27.)

Inmates requiring medical care at Elmira are treated in the medical department, which is housed in its own building and consists of the clinical area on the first floor and the infirmary on the second floor.   (Tr. at 644.)   To initiate contact with the medical department, inmates request "sick calls."   (Tr. at 617, 655-656.)   Once a sick call is submitted, inmates are seen by DOCCS physicians and nurse practitioners, who are general practitioners, not specialists or surgeons.   (See, e.g., Tr. at 611; Court Exhibit 1 ("Yin Tr.") at 22, 76.[11])

---

10 Except as may be noted herein, this Court finds each witness to be credible.

11 Dr. Yin's trial testimony was preserved on June 2, 2017.   (Court Exhibit 1 ("Yin Tr.") at 1.)   At that time, Dr. Yin was 86 years old, resided in California, was in poor health, and was the primary caregiver for his 86-year-old ill wife.   (Tr. at 371, 374; Yin Tr. at 76.)   Dr. Yin was consequently unable to travel to Buffalo for trial.   (Tr. at 374.)   The parties therefore agreed to record his trial testimony remotely.   (Tr. at 371, 374.)   The attorneys were present in Buffalo and Dr. Yin was present in California.   (Tr. at 371, 374.)   A videographer and a stenographer recorded Dr. Yin's testimony and preserved it on three DVDs, which were each played at trial.   (Tr. at 367, 372-373; Docket Nos. 289, 293.)   The recorded testimony constituted the substantive evidence for this Court's consideration.   (Tr. at 367-368.)   Defendants also presented a certified transcript of the recorded testimony, which was marked as Court Exhibit 1 and filed at docket number 317.   (Tr. at 367-368, 373.)   Because the transcript of the recorded testimony is certified, this Court accepted it as the trial transcript and did not require the court reporter to again record Dr. Yin's testimony as it was played in court.   (Tr. at 368.)   The court reporter remained present, however, to record

Inmates are required to use the sick-call system to secure prescription refills. (Tr. at 184, 617, 655-656.) In the absence of a sick-call request, the medical department has no way of knowing whether a given inmate's prescription needs to be refilled. (Tr. at 656.) It is thus the inmate's responsibility to seek renewal of his prescriptions, not the medical department's responsibility. (Tr. at 441; Yin Tr. at 54, 119.) Sick-call requests seeking prescription refills are processed by the nursing staff and set aside for the appropriate physician to complete. (Tr. at 617, 655-56.) Davidson was aware of this procedure. (Tr. at 184-187.)

Medical department physicians and nurse practitioners prescribe narcotic pain medications in 30-day increments, usually after a physical examination to confirm the continuing need for the prescription. (Tr. at 417-418, 420-421, 441, 541.) Those medications are then dispensed to inmates through the infirmary. (Tr. at 541, 592.) Non-narcotic pain medications were prescribed for longer periods and dispensed directly to inmates to take as needed. (Tr. at 542-543, 627.)

Inmate prescriptions, consultations, examinations, and test results are recorded in an ambulatory health record, which is an individual chronology of each inmate's interaction with the medical department. (Tr. at 386-87, 524-525, 601.) Medical care providers rely on the ambulatory health record to ensure continuity of care and treatment. (Tr. at 387, 480, 601; Yin Tr. at 95.) Care provided by both medical department staff and outside specialists is recorded in the ambulatory health record.

---

any in-court discussions during the playback of Dr. Yin's testimony. (Tr. at 364, 368.) All parties agreed to this arrangement. (Tr. at 373.) The three DVDs containing Dr. Yin's trial testimony are filed at docket number 317. (Tr. at 364, 367.) This Court's rulings concerning the objections lodged during the recorded testimony are set forth in the appendix to this decision. (Tr. at 364-365, 699-700; 712-713, 723.)

Because medical department physicians are general practitioners, a referral system is in place for inmates who require specialized assessment or care. (Tr. at 400, 565-566; Yin Tr. at 14.) When a medical department physician determines that an outside referral is necessary, he or she must apply for approval of the referral. (Tr. at 400, 565-566; Yin Tr. at 14-15.) Such applications are made to Wexford Managed Care, which is akin to a health-care plan for DOCCS inmates. (Tr. at 351, 400, 565-566; Yin Tr. at 14-15.) If Wexford approves the referral, it schedules the inmate for an appointment with the recommended specialist. (Tr. at 351, 400, 565-566; Yin Tr. at 14-15.) If Wexford denies the referral, medical department physicians may appeal or seek approval directly from the DOCCS regional health services director, who was Dr. Trabout at the time. (Tr. at 566.)

Once engaged, outside specialists can only make recommendations to DOCCS physicians; they cannot directly order inmate care or procedures. (Tr. at 97, 355, 496, 500-501, 668-669.) Conversely, DOCCS physicians cannot order surgical or specialized procedures unless recommended by a specialist. (Tr. at 611; Yin Tr. at 22.) Medical department physicians must therefore review specialists' reports and then determine how to proceed in consultation with the inmate patient. (Yin Tr. at 73, 77-79, 85.) If the medical department physician concurs in the specialist's recommendation, he or she must again seek approval of the recommended course of treatment (e.g., surgery) from Wexford. (Tr. at 496-497, 499, 501-502; Yin Tr. at 14.)

While Davidson was at Elmira, his medical care was principally provided by Defendants Yin, Desai, Fowler, and Canfield, all of whom worked for the medical

department.   (Tr. at 87, 482, 600; Yin Tr. at 9.)   Between 1999 and 2002, Drs. Yin and Desai were the only physicians on staff.   (Tr. at 482; Yin Tr. at 79.)   They were assisted by Nurse Practitioner Fowler.   (Tr. at 522, 523.)   In June 2002, Dr. Canfield replaced Dr. Desai as a clinical physician and was then promoted two months later to facility health services director.   (Tr. at 384-385, 472-473, 599.)   In this capacity, Dr. Canfield continued to provide clinical care, but also assumed administrative and supervisory duties, and was generally responsible for inmate medical care.   (Tr. at 599-600.)

**B. Davidson's First Claim (Shoulder)**

**1. Medical Treatment**

Davidson arrived at Elmira with a pre-existing shoulder condition suffered during a handcuffing incident at another DOCCS facility in April of 1998.   (Tr. at 86-87; Yin Tr. at 12; Defendants' Exhibits B-32, B-442, B-623.)   While at Elmira, medical staff repeatedly treated Davidson's shoulder condition as follows:

On January 15, 1999, Davidson was seen in the medical department and requested an appointment with an orthopedic doctor to have his left shoulder examined. (Tr. at 88; Defendants' Exhibit B-002.)

On May 14, 1999, X-rays of Davidson's left shoulder yielded normal results.   (Yin Tr. at 10-11; Defendants' Exhibit B-369.)

On July 1, 1999, Dr. Yin examined Davidson.   (Yin Tr. at 11; Defendants' Exhibit B-32.)   X-rays of Davidson's left shoulder showed no structural abnormalities.   (Yin Tr. at 11-12; Defendants' Exhibit B-369.)   Nonetheless, because Davidson was reporting pain, Dr. Yin noted that he would refer him to an orthopedic surgeon for further

11

assessment, which he did on July 20, 1999. (Tr. at 89-90, 201; Yin Tr. at 12-17; Defendants' Exhibits B-16, B-32, B-39.)

Dr. Yin examined Davidson again on July 30, 1999, and again referred him to an orthopedic surgeon for evaluation of his left shoulder. (Yin Tr. at 16; Defendants' Exhibit B-39.)

On September 18, 1999, Davidson saw orthopedic surgeon Frederick Kaempffe. (Yin Tr. at 16, 18; Defendants' Exhibit B-442.) Dr. Kaempffe found that Davidson had a tender AC joint,[12] but no instability. (Yin Tr. at 17; Defendants' Exhibit B-442.) He concluded that no surgery was required and recommended that Davidson's request for an MRI be denied because it was not medically indicated. (Tr. at 90-91; Yin Tr. at 17, 18; Defendants' Exhibit B-442.) Dr. Kaempffe also noted Davidson's request for a second opinion, which Dr. Yin arranged. (Tr. at 91, 93, 202; Yin Tr. at 17-18; Defendants' Exhibits B-48, B-442, B-623.)

On February 1, 2000, Davidson saw Dr. Mosher for a second opinion. (Tr. at 93, 493; Exhibit B-623.) Dr. Mosher suggested trying DepoMedrol shots before considering surgery. (Tr. at 94, 494; Defendants' Exhibit B-623.) He also recommended surgically resecting Davidson's distal clavicle if the DepoMedrol shot did not bring relief. (Tr. at 94, 402-403, 494; Defendants' Exhibit B-623.) Dr. Desai reviewed Dr. Mosher's report the next day. (Tr. at 401-402; Defendants' Exhibit B-623.)

On February 29, 2000, Dr. Desai requested and recommended a further orthopedic consultation for Davidson's left shoulder. (Tr. at 94; Defendants' Exhibit B-

---

12 "AC" refers to the acromioclavicular joint. (Tr. at 402-403; Yin Tr. at 32.) This is the joint between the clavicle and the shoulder. (Tr. at 403; Yin Tr. at 32, 88.)

675.)

Several months later, on April 4, 2000, Davidson saw consultative orthopedic surgeon Dr. Webster for the DepoMedrol injections that Dr. Mosher recommended. (Tr. at 94; Yin Tr. at 30; Defendants' Exhibit B-675.) Dr. Webster found minimal symptoms from AC joint arthritis and recommended physical therapy and follow up with Dr. Mosher. (Yin Tr. at 30-31; Defendants' Exhibit B-675.) Dr. Webster did not recommend surgery. (Yin Tr. at 31.)

On May 17, 2000, Dr. Desai examined Davidson's left shoulder and found no serious condition, but because Davidson had already received a steroid injection that did not appear to work, he referred Davidson for another orthopedic consultation. (Tr. at 424-425; Defendants' Exhibits B-119, B-120.)

On July 13, 2000, Dr. Desai again referred Davidson for follow-up with the orthopedic surgeon for shoulder pain. (Tr. at 96, 100, 421, 431; Defendants' Exhibits B-134, B-763.)

In August 2000, Davidson had physical therapy for his shoulder, but it did not improve his shoulder pain. (Tr. at 95; Defendants' Exhibit B-809.)

On September 5, 2000, Davidson went back to see Dr. Mosher, who determined that he had arthritis in both shoulders. (Tr. at 96; Yin Tr. at 32, 80; Defendants' Exhibit B-818.) Dr. Mosher recommended surgical resection of Davidson's left distal clavicle. (Tr. at 96-98, 202, 494-495; Yin Tr. at 31-32, 80; Defendants' Exhibits B-818, B-820.)

The next day, Dr. Desai reviewed Dr. Mosher's recommendation and concurred in his assessment that surgery on his left shoulder was warranted. (Yin Tr. at 80-83;

13

Defendants' Exhibit B-818.)   Davidson testified that he thought Dr. Yin approved the surgery (Tr. at 104), but Dr. Yin testified that he did not see or act on Dr. Mosher's recommendation, which Dr. Desai approved.   (Yin Tr. at 33, 84, 85, 89; Defendants' Exhibit B-820.)   Both Dr. Mosher and Davidson signed a consent-to-operate form and surgery was thereafter scheduled for November 10, 2000.   (Tr. at 98-99, 112; Defendants' Exhibits B-820, B-821, B-857.)

That same day—September 6, 2000—Davidson attended physical therapy for his shoulder.   (Tr. at 99; Defendants' Exhibit B-822.)   After that session, the physical therapist recommended discontinuing physical therapy due to lack of progress.   (Tr. at 99-100; Defendants' Exhibit B-822.)   The next day, Dr. Yin discontinued Davidson's participation in physical therapy as recommended but approved his continued use of a Theraband to strengthen his shoulder.   (Yin Tr. at 33-34; Defendants' Exhibit B-149.)

On September 18, 2000, Dr. Desai noted that Davidson requested to see Dr. Kaempffe for a second opinion concerning his consultation with Dr. Mosher.   (Tr. at 438-439; Defendants' Exhibit B-151.)   Davidson testified that he was not seeking a second opinion, but rather, wanted to ask Dr. Kaempffe questions about the procedure that Dr. Mosher recommended.   (Tr. at 102-103, 115-117, 203.)

On September 25, 2000, Dr. Desai again noted that Davidson was asking to see Dr. Kaempffe before surgery.   (Tr. at 442; Defendants' Exhibit B-153.)

On October 2, 2000, Davidson submitted a written request to see Dr. Kaempffe concerning the surgery scheduled with Dr. Mosher.   (Tr. at 102-103, 447; Defendants' Exhibits B-169, B-835.)   Dr. Desai read and initialed this letter the next day.   (Tr. at 447;

14

Defendants' Exhibit B-835.)

On October 3, 2000, Dr. Desai examined Davidson, at which time Davidson again requested a meeting with Dr. Kaempffe concerning the upcoming surgery. (Tr. at 443, 444; Defendants' Exhibits B-155, B-156.)

Davidson testified that during this time, his shoulder condition caused him serious pain. (Tr. at 120.) His left shoulder hurt constantly day and night, whether he was active or motionless. (Tr. at 120-121.) It impacted his ability to dress, shave, and be physically active. (Tr. at 121.) Davidson estimated his pain to be between an 8 and a 9 on a 10-point scale, but could be a 7 or 8 on a good day. (Tr. at 127.)

On November 2, 2000, Davidson saw Nurse Practitioner Fowler for a preop appointment ahead of the scheduled shoulder surgery. (Tr. at 450, 531; Defendants' Exhibit B-163.) During that appointment, Davidson refused to submit to a preop chest X-ray, which Fowler advised was required by the hospital. (Tr. at 104, 203, 450, 531-532; Defendants' Exhibit B-163.) SUNY Syracuse Hospital required a current chest X-ray to screen for tuberculosis because it had previously experienced a tuberculosis outbreak caused by an inmate. (Tr. at 105-106, 108-109, 203, 450, 532.) SUNY Syracuse required that the chest X-ray be completed within one year of the scheduled surgery. (Tr. at 450-451, 531-532.) Davidson's previous chest X-ray was from November 9, 1999, and his surgery was scheduled for November 10, 2000, so a new X-ray was required under the hospital's policy. (Tr. at 106-107, 532, 584; Defendants' Exhibit B-163; Plaintiff's Exhibit 10.)

Nurse Practitioner Fowler tried to convince Davidson to have the X-ray so that he

could have the surgery (Tr. at 533), but Davidson did not want the additional exposure to radiation. (Tr. at 105-106, 108-109, 203, 450, 532.) Fowler testified that while Davidson's concern was reasonable, X-rays expose patients to very minute levels of radiation. (Tr. at 582.) Nonetheless, Davidson persisted in his refusal to have the X-ray, resulting in the cancellation of his surgery. (Tr. at 105, 109, 112, 113, 114, 203, 532, 566-567; Defendants' Exhibit B-857.)

On November 14, 2000, Dr. Desai noted that Davidson had changed his mind and would agree to the chest X-ray so that he could have the shoulder surgery. (Tr. at 109, 111, 115, 203, 451-452; Defendants' Exhibit B-165.) Dr. Desai therefore arranged to have Davidson's surgery rescheduled for December 15, 2000. (Tr. at 118, 204, 452-453, 505; Yin Tr. at 90; Defendants' Exhibits B-165, B-169, B-175.)

On November 17, 2000, Davidson met with Dr. Desai to complete the pre-op paperwork for the rescheduled surgery. (Tr. at 454; Defendants' Exhibit B-166.)

On November 28, 2000, medical department staff noted that Davidson was still requesting to see Dr. Kaempffe to discuss his surgery. (Tr. at 455; Defendants' Exhibit B-169.)

On November 29, 2000, Nurse Practitioner Fowler noted that Davidson had been evaluated by Dr. Kaempffe in August 1999; had seen Dr. Mosher for a second opinion in February 2000; and was examined by Dr. Webster in April 2000. (Tr. at 533; Defendants' Exhibit B-169.) Based on this history, and after consulting with Dr. Yin, Fowler denied Davidson's repeated requests to meet with Dr. Kaempffe about the upcoming surgery. (Tr. at 103, 117, 533-534; Defendants' Exhibit B-169.) Fowler concluded that if Davidson

16

had questions about the surgery, he should discuss them with Dr. Mosher, not Dr. Kaempffe.  (Tr. at 534.)

On December 9, 2000, Nurse Practitioner Fowler discontinued Davidson's use of the TheraBand because he was awaiting surgery on his shoulder.  (Tr. at 535-536; Defendants' Exhibit B-173.)

On December 14, 2000, the night before surgery, Dr. Mosher canceled the operation.  (Tr. at 118-119; Defendants' Exhibits B-175, B-882; B-907; Defendants' Exhibit O.)  Wexford notified the medical department that it had canceled the surgery because "Dr. Mosher at this point is opting not to proceed w/the scheduled surgery for tomorrow."  (Tr. at 537-538; Defendants' Exhibit B-882.)

No one initially explained to Davidson why his surgery was canceled.  (Tr. at 122-125.)  Wexford indicated that Dr. Mosher simply opted not to proceed with the surgery.  (Defendants' Exhibit B-882; Defendants' Exhibit O.)  Dr. Yin testified that he was not at all involved in the cancellation of Davidson's surgery and never communicated about the surgery with Dr. Mosher.  (Yin Tr. at 36, 91.)  He further testified that Davidson's medical record indicates that Dr. Mosher canceled Davidson's surgery because he was no longer providing services through Wexford.  (Yin Tr. at 37, 90-91; Defendants' Exhibit B-906.)  Ultimately, Dr. Yin testified that he never learned exactly why Dr. Mosher canceled the surgery.  (Yin Tr. at 122-123.)  The fact remained, however, that Dr. Mosher is the one who canceled Davidson's surgery.  (Tr. at 204-206, 536, 567.)

On December 20, 2000, Nurse Practitioner Fowler reconsidered his discontinuation of Davidson's TheraBand after Davidson filed a grievance against him.

(Tr. at 538-539; Defendants' Exhibit B-176.)   Fowler reinstated use of the TheraBand pending a physical therapy consultation, which he ordered.   (Tr. at 539; Defendants' Exhibit B-176.)

On December 21 and 26, 2000, Davidson pursued having his surgery rescheduled for a second time.   (Tr. at 122-123, 128; Defendants' Exhibits B-177, B-886.)   Three days later, Dr. Desai requested that Davidson be seen again by Dr. Kaempffe, since Dr. Mosher had canceled the surgery.   (Tr. at 129, 130, 506-507; Yin Tr. at 37-38; Defendants' Exhibits B-906, B-907.)

On January 5, 2001, Dr. Kaempffe examined Davidson and ordered more X-rays of his shoulder.   (Tr. at 131; Defendants' Exhibit B-907.)

Dr. Yin then examined Davidson again on January 11, 2001.   (Yin Tr. at 38; Defendants' Exhibits B-183, B-184.)   At that time, Dr. Yin recommended that Davidson continue to follow up with Dr. Kaempffe for his shoulder pain.   (Yin Tr. at 39; Defendants' Exhibits B-183, B-184.)   Dr. Yin also noted that Davidson requested an explanation for why his surgery was canceled, and that he advised him that it was not his obligation to find out.   (Tr. at 122-125; Yin Tr. at 40-41, 93-94, 122; Defendants' Exhibit B-184.)   Dr. Yin testified that he did not want to get involved in any personal problems between Davidson and Dr. Mosher, so he did not want to investigate the reasons for the cancellation.   (Yin Tr. at 41.)   The next day, Davidson again requested that his surgery be rescheduled.   (Tr. at 131; Defendants' Exhibit B-186.)

On March 9, 2001, Dr. Kaempffe examined Davidson and reviewed his shoulder X-rays.   (Yin Tr. at 41, 42; Defendants' Exhibit B-949.)   He found that Davidson's X-rays

were normal; that an MRI was not medically indicated; and that surgery was not required. (Yin Tr. at 41, 42; Defendants' Exhibit B-949.)   Davidson again asked for a second opinion.   (Tr. at 131-132; Yin Tr. at 41-42; Defendants' Exhibits B-186, B-199, B-949.)

On March 29, 2001, Dr. Yin examined Davidson.   (Yin Tr. at 42-43; Defendants' Exhibit B-204.)   He noted Davidson's continuing complaints of pain in his left shoulder and referred him for an orthopedic consultation.   (Yin Tr. at 43-44; Defendants' Exhibits B-204, B-205.)

On June 28, 2002, Dr. Yin noted that Davidson had treated with an orthopedic surgeon who administered a steroid shot and planned a shoulder shaving procedure. (Yin Tr. at 67-69; Defendants' Exhibit B-307.)   Dr. Yin's plan for treatment was to have Davidson continue to follow up with the orthopedic surgeon.   (Tr. at 610; Yin Tr. at 69; Defendants' Exhibit B-307.)

On October 4, 2002, Dr. Kaempffe's office saw Davidson again.   (Yin Tr. at 69; Defendants' Exhibit B-1204.)   The nurse practitioner or physicians' assistant who examined Davidson noted that the steroid shot provided temporary relief of his bilateral shoulder pain.   (Tr. at 610; Yin Tr. at 70; Defendants' Exhibit B-1204.)   Surgery was therefore not recommended, though repeated bilateral shoulder films were requested. (Tr. at 610-611; Yin Tr. at 70; Defendants' Exhibit B-1204.)   Dr. Kaempffe also recommended denying Davidson's request for an MRI, finding that it was not medically indicated.   (Yin Tr. at 70; Defendants' Exhibit B-1204.)

Neither Dr. Kaempffe nor any other specialist ever recommended surgery for

Davidson's left shoulder in the remaining time he was housed at Elmira.[13]   (Tr. at 118, 119, 130.)

### 2. Retaliation

Davidson testified that his shoulder surgeries were canceled in retaliation for him filing grievances against Defendants Yin, Desai, Canfield, Bennett, and West.   (Tr. at 151-154.)   Without identifying any grievances he may have filed, Davidson stated that each defendant responded to his grievances with anger.   (Tr. at 152.)   He described the defendants' collective sentiment as: "[Y]ou expect good treatment from us or you expect favors from us, but yet you grieve us, you complain about us, so don't expect good treatment from us."   (Tr. at 153.)

According to Davidson, these sentiments were directed at the cancellation of his surgeries.   (Tr. at 154.)   For example, Davidson testified that when Nurse Practitioner Fowler told him he had canceled the November 2000 surgery, he said "who won this time?" or "who won?"   (Tr. at 110, 154.)   Fowler testified, however, that he did not cancel the November surgery out of any dislike for Davidson.   (Tr. at 533.)

Davidson also testified about an email sent by Dr. Canfield.   When Davidson was transferred to the Auburn Correctional Facility on December 24, 2004, Dr. Canfield sent an email to Dr. Kooi, who was a physician at Auburn.   (Tr. at 134, 648.)   Dr. Canfield advised Dr. Kooi of some of Davidson's medical issues and also told him that Davidson

---

13 Almost a decade after Davidson left Elmira, a DOCCS specialist recommended surgery on his left shoulder while he was housed at the Shawangunk Correctional Facility.   (Tr. at 137-139, 141; Defendants' Exhibits C-1433, C-1571.)   Although that surgery was approved, it was scheduled for the very day Davidson was to be released on parole, which would have required additional voluntary confinement.   (Tr. at 144, 146.)   Davidson therefore declined the surgery.   (Tr. at 146.)

"grieves a great deal, but the central office grievance staff know him, how to deal with him." (Tr. at 652; Plaintiff's Exhibit 5.) Dr. Canfield testified that he sent this email as a professional courtesy so that Dr. Kooi could "understand the total patient that he was getting." (Tr. at 648-649, 652.) Dr. Canfield conceded, however, that it was not his ordinary practice to send such emails. (Tr. at 649.)

Each of the administrator defendants testified that they had no role in the treatment of Davidson's shoulder condition or the cancellation of his surgeries. Defendant Bennett testified that as superintendent, he was in charge of the medical unit at Elmira, but had no involvement in inmate care or the day-to-day running of the medical unit, which was done by the medical director. (Tr. at 244, 276.) He further testified that although he had the authority to cancel medical appointments for security reasons, he could not recall ever canceling a medical appointment for Davidson or any other inmate while he was superintendent. (Tr. at 244.) Defendant West similarly testified that he was never involved in approving or disapproving medical procedures for inmates. (Tr. at 307.) Defendant Smith also testified that he had no role in the delivery of healthcare to inmates or decisions about inmates' medical care. (Tr. at 344.)

### C. Davidson's Second Claim (Back)

#### 1. Medical Evidence

Davidson suffered chronic back pain as a result of a 1988 back surgery. (Tr. at 156-157, 657; Defendants' Exhibit B-575.) Medical staff at Elmira treated his back condition as follows:

On June 9, 1999, the day after Davidson arrived at Elmira, Nurse Practitioner

21

Fowler examined him.  (Tr. at 527; Defendants' Exhibit B-29.)  During that examination, Davidson told Fowler that he had been granted passes at Wende that permitted him to shower on the block and eat in his cell.  (Tr. at 525-530.)  He also told Fowler that he had a restriction on heavy lifting and that he received pain medication for his back.  (Tr. at 529-530.)  Based on those representations, Fowler continued Davidson's passes and prescribed him Tylenol with codeine for pain.  (Tr. at 529-530; Defendants' Exhibit B-29.)  Fowler later learned from officials at Wende, however, that Davidson had not been receiving passes or pain medication, so Fowler discontinued both.  (Tr. at 530.)

About one month later, on July 1, 1999, Dr. Yin examined Davidson.  (Yin Tr. at 11; Defendants' Exhibit B-32.)  Dr. Yin convinced Davidson to have a myelogram to assess his spinal condition, after Davidson was previously uncooperative during the scheduled procedure.  (Yin Tr. at 12, 14; Defendants' Exhibit B-32.)  Dr. Yin also advised Davidson to avoid heavy lifting to reduce his back pain.  (Yin Tr. at 13-14; Defendants' Exhibits B-32, B-33.)

Davidson saw Dr. Yin again on August 23, 1999, at which time Dr. Yin reviewed the results of the August 17, 1999 myelogram.  (Yin Tr. at 19; Defendants' Exhibit B-44.)  Dr. Yin found that the myelogram showed no acute back problem.  (Yin Tr. at 19, 20; Defendants' Exhibit B-44.)  But because he still could not find a source for Davidson's back pain, Dr. Yin referred him to a neurosurgeon for further examination.  (Yin Tr. at 19-21; Defendants' Exhibits B-44, B-402.)

Dr. Yin saw Davidson again on September 15, 1999, at which time Davidson complained of continued pain.  (Yin Tr. at 22; Defendants' Exhibit B-50.)  Dr. Yin again

recommended that Davidson be seen by a neurosurgeon.   (Yin Tr. at 22; Defendants' Exhibit B-22.)

On November 24, 1999, Davidson had a discogram performed at Strong Memorial Hospital, following which he suffered from continued chronic back pain.   (Tr. at 154, 155, 157, 184, 469, 563; Yin Tr. at 26-27; Defendants' Exhibits B-302, B-575, B-600.) Davidson developed septicemia from that procedure, which required the administration of intravenous antibiotics.   (Tr. at 155.)   He was discharged on Darvocet and Flexeril to treat low back pain.   (Tr. at 156.)   Upon return from the hospital, Davidson was housed in the infirmary through December 16, 1999.   (Tr. at 156, 197; Defendants' Exhibit B-575.)

On December 6, 1999, Dr. Yin again requested that Davidson be examined by a neurosurgeon for his back pain.   (Yin Tr. at 26-27; Defendants' Exhibit B-600.)   This request was approved; Davidson was seen by a neurosurgeon in January 2000.   (Yin Tr. at 27, 28.)

On December 24, 1999, Dr. Desai examined Davidson to address his back pain and assess his request to change his pain medication from Darvocet to Percocet.   (Tr. at 388; Defendants' Exhibit B-72.)   After making detailed findings, Dr. Desai determined that Davidson could take Percocet for pain, should use heating pads, and could ambulate as tolerated.   (Tr. at 388-393; Defendants' Exhibit B-72.)   Dr. Desai also determined that Davidson should take Tylenol if he did not tolerate Percocet.   (Tr. at 392; Defendants' Exhibit B-72.)   Dr. Desai preferred treating Davidson with Tylenol because it was a non-narcotic, non-habit-forming medicine that was also safer for the stomach and kidneys.

(Tr. at 392.)

On December 30, 1999, Dr. Desai found no significant change in Davidson's back condition since his last benign examination six days earlier, but prescribed Darvocet for pain. (Tr. at 395-396; Defendants' Exhibit B-74.)

On January 4, 2000, Dr. Yin noted that Davidson had been treated by the pain clinic and that the clinic recommended continuing Davidson on Darvocet but changing his dosage. (Yin Tr. at 24-25; Defendants' Exhibit B-75.) The pain clinic also recommended administering pain-block medication to Davidson's spinal cord, which Dr. Yin adopted into his treatment plan. (Yin Tr. at 24-26; Defendants' Exhibit B-75.)

Later that month, on January 25, 2000, Davidson saw Dr. Desai again, who found no change from his previous examinations. (Tr. at 396-398; Defendants' Exhibits B-84, B-85.) Dr. Desai determined that Davidson's low back pain was benign and stable. (Tr. at 398.) He prescribed Darvocet and heating pads, but noted that Davidson requested a decrease in Darvocet dosage, indicating that his pain was improving. (Tr. at 398; Defendants' Exhibit B-84.) Dr. Desai also noted that Davidson had been seen by a neurosurgeon on January 10, 2000, in connection with his back pain. (Tr. at 399; Defendants' Exhibit B-85.)

On February 1, 2000, Dr. Yin noted that Davidson had an MRI done on January 25, 2000, that was suggestive of inflammatory disc disease. (Yin Tr. at 29; Defendants' Exhibit B-87.) He recommended that Davidson follow up with a neurosurgeon. (Yin Tr. at 29-30; Defendants' Exhibit B-87.)

On February 8, 2000, Dr. Desai encountered Davidson in a hallway at Elmira, at

which time Davidson told him that he had run out of Darvocet and needed his prescription refilled.  (Tr. at 404-405; Defendants' Exhibit B-89.)  Dr. Desai thereafter ordered a refill of Darvocet, as requested.  (Tr. at 405; Defendants' Exhibit B-89.)

On February 14, 2000, Dr. Desai saw Davidson in the medical department and discussed multiple issues.  (Tr. at 405-406; Defendants' Exhibits B-90, B-91.)  Davidson requested a second opinion concerning his back pain and complained that his neurologist and neurosurgeon had not been examining him completely.  (Tr. at 406; Defendants' Exhibit B-90.)  Dr. Desai again examined Davidson's back and found no changes from the earlier benign examinations.  (Tr. at 406.)  Dr. Desai advised Davidson that he would recommend a second opinion only if the specialists Davidson was seeing recommended a second opinion, and he continued Davidson's Darvocet prescription for pain as needed. (Tr. at 407, 410; Defendants' Exhibit B-90.)

One month later, on March 14, 2000, Davidson reported that he had no improvement in his back pain and that he skipped doses of Darvocet when he was not experiencing pain.  (Tr. at 411-412; Defendants' Exhibits B-95, B-96.)  Dr. Desai told him to attend physical therapy sessions consistently, because Davidson had missed his last session.  (Tr. at 95, 412.)  Dr. Desai again examined Davidson and found no changes in his back condition.  (Tr. at 413; Defendants' Exhibit B-95.)  Dr. Desai continued Davidson's Darvocet prescription, but noted his concerns about long-term treatment with narcotics.  (Tr. at 413-414; Defendants' Exhibits B-95, B-96.)

On April 11, 2000, Dr. Desai re-filled Davidson's Darvocet prescription.  (Tr. at 415-416; Defendants' Exhibit B-107.)  About two weeks later, he renewed Davidson's

Celebrex prescription.   (Tr. at 416-417; Defendants' Exhibit B-110.)

On April 25, 2000, Dr. Desai examined Davidson and found his back condition to be unchanged.   (Tr. at 418; Defendants' Exhibit B-110.)

On May 4, 2000, Dr. Desai renewed Davidson's Darvocet prescription.   (Tr. at 419-420; Defendants' Exhibit B-115.)

On May 11, 2000, Dr. Desai noted that he had consulted with Wexford to get approval for Davidson to receive an MRI of his back.   (Tr. at 421-422; Defendants' Exhibit B-117.)

On May 17, 2000, Dr. Desai referred Davidson to the pain clinic.   (Tr. at 426; Defendants' Exhibits B-119, B-120.)   The next day, he contacted Strong Memorial Hospital to arrange an MRI.   (Tr. at 427; Defendants' Exhibit B-120.)

On June 21, 2000, Dr. Desai continued Davidson's prescription for Darvocet.   (Tr. at 427-428; Defendants' Exhibit B-130.)

On July 13, 2000, Dr. Desai examined Davidson again.   (Tr. at 429; Defendants' Exhibit B-134.)   He found that Davidson's lower back condition and pain was unchanged. (Tr. at 429-430; Defendants' Exhibit B-134.)   Dr. Desai therefore denied Davidson's request for a follow-up MRI of his back and instead referred Davidson back to the pain clinic.   (Tr. at 430; Defendants' Exhibit B-134.)   Dr. Desai also renewed Davidson's pain medications.   (Tr. at 96, 100, 421; Defendants' Exhibits B-134, B-763.)

On August 1, 2000, Dr. Desai continued Davidson's Darvocet prescription.   (Tr. at 431-432; Defendants' Exhibit B-138.)   One week later, he continued Davidson's Celebrex prescription.   (Tr. at 432-433, 436; Defendants' Exhibit B-139.)

26

On August 10, 2000, Dr. Desai examined Davidson.  (Tr. at 433-434; Defendants' Exhibit B-140.)  There was no change in the condition of Davidson's back, although Davidson reported that his back pain was improving.  (Tr. at 434; Defendants' Exhibit B-140.)  Dr. Desai once again referred Davidson to the pain clinic.  (Tr. at 435; Defendants' Exhibit B-140.)

On August 25, 2000, Desai continued Davidson's Darvocet prescription.  (Tr. at 437; Defendants' Exhibit B-145.)

On September 22, 2000, Dr. Desai continued Davidson's prescription for Darvocet.  (Tr. at 440-441; Defendants' Exhibit B-152.)  He also renewed Davidson's passes for showering on the block and eating in his cell, which had been issued to accommodate his back pain.  (Tr. at 441.)

On October 3, 2000, Dr. Desai examined Davidson again and determined that his back condition had not changed.  (Tr. at 443-444; Defendants' Exhibits B-155, B-156.)  Dr. Desai also counseled Davidson about the continued use of Darvocet given its addictive qualities.  (Tr. at 444; Defendants' Exhibit B-155.)  Davidson, however, did not want to change his medication.  (Tr. at 444.)  Dr. Desai also noted that he was trying to get Wexler to accept Davidson back into the pain clinic, after Davidson had previously demonstrated a poor attitude with one of the doctors there.  (Tr. at 437-438, 445; Defendants' Exhibits B-150, B-156.)

On October 24, 2000, Dr. Desai decreased Davidson's Darvocet to an "as needed" basis because Davidson had not taken it regularly during the previous month.  (Tr. at 448-449; Defendants' Exhibit B-160.)  Dr. Desai viewed Davidson's reduced

consumption of Darvocet as a good sign indicating that his pain was resolving to a point of no pain or tolerable pain. (Tr. at 449.)

On November 10, 2000, Dr. Desai renewed Davidson's Darvocet prescription. (Tr. at 453; Defendants' Exhibit B-165.)

On November 22, 2000, Dr. Desai noted in Davidson's record that he was still trying to get an MRI of Davidson's back approved through Wexford. (Tr. at 454-455; Defendants' Exhibit B-168.)

On December 6, 2000, Dr. Desai renewed Davidson's Darvocet prescription. (Tr. at 456; Defendants' Exhibit B-172.)

Dr. Yin examined Davidson on January 11, 2001. (Yin Tr. at 38; Defendants' Exhibits B-183, B-184.) At that time, Dr. Yin recommended that Davidson continue Darvocet and not engage in any heavy lifting to limit his back pain. (Yin Tr. at 39; Defendants' Exhibits B-183, B-184.)

On February 1, 2001, Davidson saw a pain-management specialist at SUNY Syracuse, whom he subsequently saw several more times. (Tr. at 157-158, 183; Defendants' Exhibit B-920.)

On February 2 and March 1, 2001, Dr. Yin continued Davidson's Darvocet prescription. (Tr. at 457, 458; Defendants' Exhibits B-189, B-195.)

On March 4, 2001, the nursing staff noted that Davidson did not come to the infirmary to take his Darvocet. (Tr. at 541; Defendants' Exhibit B-198.)

On March 19, 2001, Nurse Practitioner Fowler wrote Davidson a 3-month prescription for Celebrex. (Tr. at 542-543; Defendants' Exhibit B-202.)

Ten days later, Dr. Yin examined Davidson and determined that he had full range of motion in his back, which indicated no serious problems. (Yin Tr. at 42-43; Defendants' Exhibit B-204.)

On April 3, 2001, Dr. Yin renewed Davidson's Darvocet prescription. (Tr. at 543; Defendants' Exhibit B-206.) Two weeks later, Dr. Yin requested pain management for Davidson. (Tr. at 160-162, 607; Defendants' Exhibit B-982.) The pain management specialist subsequently recommended that Davidson be treated with methadone. (Tr. at 158-162, 608; Defendants' Exhibits B-210, B-920, B-982.)

On April 18, 2001, Dr. Yin noted that Davidson had been seen the previous day in the pain clinic. (Yin Tr. at 44; Defendants' Exhibit B-210.) Based on recommendations from the pain clinic, Dr. Yin agreed to prescribe methadone for Davidson's back pain and he approved the pain clinic's request that it be sent Davidson's MRI results. (Yin Tr. at 44-45; Defendants' Exhibit B-210.) At that time, Dr. Yin's treatment plan was to prescribe Davidson pain medication, have him engage in physical therapy, and have him follow up with a neurosurgeon. (Yin Tr. at 45.) The next day—April 19, 2001—Dr. Yin prescribed Davidson methadone and discontinued Darvocet. (Tr. at 162; Yin Tr. at 45-47; Defendants' Exhibits B-210, B-982.)

On April 21, 2001, Davidson reported to medical staff that he did not want methadone because it made him lethargic. (Tr. at 182, 543-544; Defendants' Exhibits B-212, B-1001.) He was therefore prescribed methadone on only an "as needed" basis. (Tr. at 594-595; Defendants' Exhibit B-212.) Davidson failed to appear the next day to take his methadone. (Tr. at 544; Defendants' Exhibit B-212.)

On April 26, 2001, Dr. Yin noted that Davidson was scheduled to see an orthopedic surgeon from Walsh.[14]   (Yin Tr. at 48; Defendants' Exhibit B-213.)   He therefore denied Davidson's request to see a back specialist at Strong Memorial Hospital in Rochester, N.Y.   (Yin Tr. at 48; Defendants' Exhibit B-213.)   Dr. Yin also noted that Davidson's back pain did not require regular treatment with narcotics,[15] and therefore, he approved Davidson's request to take methadone only as needed.   (Tr. at 49; Defendants' Exhibit B-214.)

About one month later, on May 21, 2001, Dr. Yin noted in Davidson's file that the doctor at the pain clinic refused to see Davidson.   (Yin Tr. at 50; Defendants' Exhibit B-220.)   He also noted that Davidson complained that the methadone was making him constipated.   (Yin Tr. at 50; Defendants' Exhibit B-220.)   Dr. Yin therefore prescribed Colace on an "as needed" basis to treat constipation.   (Yin Tr. at 50; Defendants' Exhibit B-220.)

On May 23, 2001, Davidson requested renewal of his methadone prescription. (Yin Tr. at 120; Defendants' Exhibit B-222.)   It appears that the prescription was not renewed, since there is no authorizing signature on the request.   (Yin Tr. at 121.)

On June 12, 2001, Dr. Yin approved Davidson's request to be seen by a neurosurgeon.   (Yin Tr. at 51-52; Defendants' Exhibit B-225.)

On June 25, 2001, Dr. Yin ordered that Davidson's methadone prescription be re-

---

14 Walsh was an outside medical provider that supplied consultation services to Elmira.   (Yin Tr. at 48.)

15 Dr. Yin's view, in fact, was that Davidson's back condition should not be treated with narcotics at all, and he advised him to stop taking narcotics entirely.   (Yin Tr. at 49; Defendants' Exhibit B-214.) Nonetheless, Dr. Yin maintained Davidson's methadone prescription on an "as needed" basis.   (Yin Tr. at 49; Defendants' Exhibit B-214.)

filled.   (Yin Tr. at 53, 54; Defendants' Exhibit B-228.)   He also noted that Davidson should be seen by a neurosurgeon to address his back pain.   (Yin Tr. at 55; Defendants' Exhibit B-226.)

On July 2, 2001, Dr. Yin prescribed Celebrex for Davidson's back pain.   (Yin Tr. at 56; Defendants' Exhibit B-229.)

On July 24, 2001, Dr. Yin renewed Davidson's prescription for methadone on an "as needed" basis.   (Tr. at 545; Defendants' Exhibit B-233.)

On July 31, 2001, Dr. Yin noted Davidson's complaints that he continued to experience back pain and that he wanted to change his medication from methadone to Oxycodone.   (Tr. at 58-59; Defendants' Exhibit B-238.)   Dr. Yin denied the request for Oxycodone and directed Davidson to continue taking methadone as needed.   (Tr. at 59; Defendants' Exhibit B-238.)   Dr. Yin also referred Davidson to the pain clinic for further consideration of his request for Oxycodone.   (Tr. at 59; Defendants' Exhibit B-238.)   The pain clinic thereafter recommended continuing with methadone and following up with a neurosurgeon.   (Tr. at 59-60; Defendants' Exhibit B-238.)

On August 29, 2001, Dr. Yin approved Davidson's request for a refill of his methadone.   (Yin Tr. at 60; Defendants' Exhibit B-242.)   Dr. Yin also referred Davidson to the pain clinic, but that referral was denied by Wexler until such time as Davidson followed up with a neurosurgeon or orthopedic surgeon for reevaluation.   (Yin Tr. at 60-61; Defendants' Exhibit B-242.)   Dr. Yin therefore referred Davidson for a neurosurgery consultation on September 6, 2001, to be completed by October 6, 2001.   (Yin Tr. at 61-63; Defendants' Exhibit B-244, B-1042.)

31

On October 4, 2001, Nurse Practitioner Fowler continued Davidson's prescription for methadone after Davidson requested renewal two days earlier. (Tr. at 546; Defendants' Exhibit B-248.)

On November 6, 2001, Dr. Yin refilled Davidson's methadone after Davidson requested that it be refilled the day before. (Yin Tr. at 65; Defendants' Exhibit B-254.) He also approved Davidson's request that he be permitted to take the methadone on an "as needed" basis. (Yin Tr. at 65; Defendants' Exhibit B-254.)

On December 3, 2001, Dr. Yin renewed Davidson's prescription for methadone after Davidson requested a sick call to request renewal. (Tr. at 548-549; Defendants' Exhibit B-261.)

On January 13, 2002, Nurse Practitioner Fowler renewed Davidson's methadone prescription after he requested renewal during a sick call. (Tr. at 549-550; Defendants' Exhibit B-269.)

On February 12, 2002, Nurse Practitioner Fowler saw Davidson. (Tr. at 550; Yin Tr. at 111-112; Defendants' Exhibit B-275.) He noted that Davidson had an orthopedic consultation scheduled for his back pain. (Tr. at 550-551; Defendants' Exhibit B-275.)

On February 15, 2002, Dr. Yin renewed Davidson's pain medications (methadone and Zyrtec). (Tr. at 551-552; Defendants' Exhibit B-277.)

On March 26, 2002, Nurse Practitioner Fowler noted that he had discussed Elmira's new pain-management policy with Davidson. (Tr. at 555; Defendants' Exhibit B-283; Defendants' Exhibit K.) This was a local policy that did not require DOCCS approval. (Tr. at 590.) Fowler helped develop the policy, which required that inmates

on narcotic pain medications be put on medical bedrest, but permitted to leave their cells for showers, law library, etc.   (Tr. at 167-170, 188, 555-556; 587; Defendants' Exhibit K.) The policy, which applied to all inmates, was implemented due to concerns about the sedative effects of narcotic medications on inmates in the general population, and in the various vocational shops in the facility, etc.   (Tr. at 167, 192, 555, 587.)   After Fowler discussed the requirements of the new policy with Davidson at length, Davidson declined further taking methadone and did not demonstrate interest in non-narcotic medications. (Tr. at 166, 169, 188-189, 554-555, 589; Defendants' Exhibit B-283.)

On April 18, 2002, Dr. Yin renewed Davidson's methadone prescription.   (Tr. at 44; Defendants' Exhibit B-210.)

On April 23, 2002, Davidson reported to the medical unit seeking medication and complaining about the medical-bedrest policy.   (Tr. at 559; Defendants' Exhibit B-291.) Davidson was given narcotic pain medication and placed on bedrest per the policy.   (Tr. at 559; Defendants' Exhibit B-291.)   Under the policy, Davidson was permitted to leave his cell to go to the law library and infirmary.   (Tr. at 559-560.)

On May 6, 2002, Dr. Yin referred Davidson to an orthopedic surgeon for evaluation of his back pain.   (Yin Tr. at 66; Defendants' Exhibit B-293.)   He also advised Davidson not to engage in any heavy lifting for six weeks.   (Yin Tr. at 66; Defendants' Exhibit B-293.)   That same day, Davidson went to the medical unit complaining of back, shoulder, and wrist pain.   (Tr. at 560-561; Defendants' Exhibit B-294.)   He also reported being off methadone.   (Tr. at 561; Defendants' Exhibit B-294.)   Fowler prescribed the non-narcotic, non-habit-forming Neurontin.   (Tr. at 561.)

On June 5, 2002, Nurse Practitioner Fowler noted that the orthopedic consultant's report had been received and that the recommendation was for conservative treatment of Davidson's back pain to include physical therapy.   (Tr. at 563; Defendants' Exhibit B-302.)

On August 12, 2002, Dr. Yin renewed Davidson's Neurontin for a 3-month period. (Tr. at 561-562, 655-656; Defendants' Exhibit B-314.)

On August 20, 2002, Dr. Canfield met with Davidson and reviewed his medical concerns.   (Tr. at 602; Defendants' Exhibit B-314.)   Dr. Canfield noted that Davidson had surgery at L5 and S1 in 1988 and suffered chronic pain in his back as a result.   (Tr. at 657.)

On September 13, 2002, Nurse Practitioner Fowler continued Davidson's prescription for Celebrex for another 3-month period.   (Tr. at 564; Defendants' Exhibit B-319.)

The medical-bedrest policy ended sometime in September 2002.   (Tr. at 170.) Davidson thereafter requested reinstatement of his methadone on September 19, 2002, which Dr. Canfield reinstated the next day.   (Tr. at 170, 606-607, 658-659; Defendants' Exhibit B-320.)

On October 1, 2002, Davidson complained of low back pain.   (Tr. at 608-609; Defendants' Exhibit B-324.)   One month later, Davidson saw Dr. Canfield, who was considering sending him to SUNY Syracuse for a consultation.   (Tr. at 618-620; Defendants' Exhibit B-328.)   Dr. Canfield examined Davidson but could not find the source of his back pain.   (Tr. at 620-622; Defendants' Exhibit B-328.)   Because

Davidson was still in pain, Dr. Canfield renewed his methadone for another 30 days.   (Tr. at 622; Defendants' Exhibit B-328.)

On November 18, 2002, Dr. Canfield prescribed Davidson methocarbamol, a muscle relaxant, to further address his back pain.   (Tr. at 623-626; Defendants' Exhibit B-332.)

On November 29, 2002, Davidson requested a sick call to renew his prescription for methadone.   (Tr. at 565; Defendants' Exhibit B-334.)   Nurse Practitioner Fowler prescribed methadone three times per day as needed.   (Tr. at 565, 626, 663; Defendants' Exhibit B-334.)

On December 2, 2002, Dr. Canfield renewed Davidson's prescription for Neurontin for three months.   (Tr. at 627; Defendants' Exhibit B-334.)

On December 23, 2002, Dr. Canfield renewed Davidson's prescription for methadone.   (Tr. at 628; Defendants' Exhibit B-336.)   One week later, he renewed his Celebrex prescription.   (Tr. at 628-629; Defendants' Exhibit B-338.)

On January 2, 2003, Dr. Canfield noted that he was attempting to get a local pain-management physician to examine Davidson as a professional courtesy to him, so that he would not have to get official approval since Davidson was already receiving pain management.   (Tr. at 630-631; Defendants' Exhibit B-338.)   Dr. Canfield wanted the local physician to review Davidson's case to make sure the other pain-management physicians were not overlooking anything.   (Tr. at 631.)

## 2.  Deliberate Indifference

Davidson testified that the named defendants were deliberately indifferent to his

back pain by not refilling his methadone prescription on May 23, 2001, and by denying him methadone from January 13-15 and February 13-18, 2002. (Tr. at 163-165, 172; Defendants' Exhibit B-222.) Davidson testified that on those dates, registered nurses in the medical department refused to provide him with his methadone as prescribed. (Tr. at 165-166, 177-179.) Davidson also testified that his methadone was abruptly discontinued as a result of the medical-bedrest policy, causing him to experience withdrawal symptoms. (Tr. at 166-169, 188-189.)

Dr. Yin conceded that Davidson's medical record from May 23, 2001, does not reflect that his methadone was renewed, since there is no authorizing signature on the request. (Yin Tr. at 121, Defendants' Exhibit B-222.) Drs. Yin, Desai, and Canfield also testified that patients taking narcotic pain medicine such as methadone may in fact experience withdrawal symptoms if they stop taking their medications abruptly. (Yin Tr. at 119, 120; Tr. at 489, 662, 670.) They therefore generally wean patients off of narcotic pain medication. (Tr. at 586, 670.) Nurse Practitioner Fowler also testified that a person could experience unpleasant withdrawal symptoms such as sweating, agitation, and tremors, if they stop taking methadone abruptly. (Tr. at 586, 590.)

Nurse Practitioner Fowler further testified that it was impossible to know whether Davidson took methadone regularly because he often missed his doses and often took it "as needed." (Tr. at 586-587.) He also testified that Davidson voluntarily elected to discontinue methadone because he did not want to be subjected to the medical-bedrest policy. (Tr. at 555-556.) Fowler further testified that Davidson's medical records do not indicate that he ever suffered any withdrawal symptoms. (Tr. at 594.) Dr. Yin also

testified that he never saw Davidson experiencing any withdrawal symptoms.   (Yin Tr. at 119.)

### D. Davidson's Third Claim (Allergies/Asthma)

Davidson alleges that Defendants Desai, Yin, Bennett, West, and Smith were deliberately indifferent to his allergy and asthma conditions by exposing him to second-hand smoke at Elmira.

#### 1. Davidson's Allergy and Asthma Condition and Treatment

Davidson arrived at Elmira with pre-existing allergies.   (Tr. at 48.)

On November 9, 1999, Davidson met with Dr. Desai.   (Tr. at 46, 473-474; Yin Tr. at 95; Defendants' Exhibit B-62.)   During that meeting, Davidson complained of shortness of breath and exposure to second-hand smoke.   (Tr. at 45-47; Yin Tr. at 95-96; Defendants' Exhibit B-62.)   Dr. Desai ordered a chest X-ray and advised Davidson to avoid smoke.   (Tr. at 44, 47, 51, 473-474; Yin Tr. at 96; Defendants' Exhibit B-62.)

On February 14, 2000, Dr. Desai saw Davidson in the medical department to discuss multiple issues, one of which was shortness of breath, which Dr. Desai addressed by examination.   (Tr. at 405-407; Defendants' Exhibit B-90.)   Dr. Desai found no acute or serious condition.   (Tr. at 407, 411, 471-472.)   He ordered an echocardiogram and directed Davidson to follow up in four weeks.   (Tr. at 407-408, 411; Defendants' Exhibit B-90.)

On March 14, 2000, Dr. Desai again examined Davidson and found no changes in his breathing issues.   (Tr. at 413; Defendants' Exhibit B-95.)   Davidson's lungs were "clear of aggravation."   (Tr. at 413; Defendants' Exhibit B-95.)

On May 17, 2000, Davidson complained of twice-daily coughing episodes, but denied any shortness of breath. (Tr. at 423-424; Defendants' Exhibit B-119.) After examination, Dr. Desai concluded that Davidson's lungs were clear and that his coughing episodes were likely a side effect of medication he was taking. (Tr. at 424; Defendants' Exhibit B-119.)

From July to October 2000, Dr. Desai examined Davidson three more times, finding clear lungs and no shortness of breath. (Tr. at 429-430, 433-434, 443; Defendants' Exhibits B-134, B-140, B-155, B-156.)

About one year later, on July 24, 2001, outside allergy specialists diagnosed Davidson with seasonal allergies and advised him to avoid second-hand smoke and other irritants. (Defendants' Exhibits B-1016, B-1017, B-1025.) Dr. Yin noted this diagnosis the next day and concurred in the specialists' recommendations. (Tr. at 478; Yin Tr. at 56-57, 106-107; Defendants' Exhibit B-232.) Dr. Yin also noted that Davidson was prescribed allergy medicine. (Yin Tr. at 107; Defendants' Exhibit B-232.)

On October 4, 2001, Davidson presented at sick call complaining of shortness of breath. (Tr. at 547-548; Defendants' Exhibit B-249.) The next day, Nurse Practitioner Fowler noted Davidson's visit and indicated that his respiratory function should be assessed at his next complaint of shortness of breath. (Tr. at 578; Defendants' Exhibit B-249.)

On November 26, 2001, Nurse Practitioner Fowler ordered a pulmonary function test to assess Davidson's shortness of breath. (Tr. at 578; Defendants' Exhibit B-258.) That test was performed on January 24, 2002, and returned mixed results. (Yin Tr. at

70-72; Defendants' Exhibit B-1109.)

On January 31, 2002, Dr. Yin reviewed the results of the pulmonary function test and found that they were consistent with obstructive airway and small airway diseases. (Yin Tr. at 110; Tr. at 76, 479, 480, 647, 649-650; Defendants' Exhibit B-273.)   Dr. Yin believed that Davidson should avoid second-hand smoke.   (Yin Tr. at 111.)

On February 12, 2002, Nurse Practitioner Fowler saw Davidson and noted that he was scheduled for a pulmonary consult to rule out allergies as the cause of his breathing issues.   (Tr. at 550, 551, 553; Yin Tr. at 111-112; Defendants' Exhibits B-275, B-1142.)   In the meantime, Fowler prescribed Davidson an Albuterol inhaler to treat his shortness of breath as needed.   (Tr. at 77-78, 483-484, 551, 578; Yin Tr. at 112-113; Defendants' Exhibit B-275.)

On March 25, 2002, the pulmonary consultant determined that Davidson's pulmonary function tests were within normal limits.   (Tr. at 554; Defendants' Exhibit B-1142.)   Nurse Practitioner Fowler reviewed this report three days later and discussed the recommendations with Dr. Trabout.   (Defendants' Exhibit B-284.)   Fowler then deferred further pulmonary testing pending the outcome of allergy shots, and he noted the possibility that Davidson may have asthma or small airway disease due to allergies.   (Tr. at 78-79, 557-558; Yin Tr. at 113-114; Defendants' Exhibit B-284.)

On May 7, 2002, Dr. Yin noted that Dr. Trabout did not believe that Davidson needed a further pulmonary function test.   (Yin Tr. at 66; Defendants' Exhibit B-294.)

Davidson was eventually diagnosed with asthma after leaving Elmira.   (Tr. at 78-81, 137; Defendants' Exhibits C-1281, C-1325.)

Dr. Canfield testified that, in his view, although Davidson presented with some evidence of airway disease while at Elmira, the pulmonary function tests did not reveal any serious condition and he never saw Davidson in respiratory distress. (Tr. at 635, 647-650; Plaintiff's Exhibit 5.) He further testified that the prescription of an Albuterol inhaler is not necessarily indicative of a serious respiratory disease because the bronchospasms it is intended to treat can also be caused by stress, emotion, exercise, or allergens. (Tr. at 636.)

### 2. Dangers of Second-hand Smoke

Davidson presented the testimony of Dr. Mary E. Reid, professor of oncology and director of cancer screening and survivorship at Roswell Park Cancer Institute in Buffalo, N.Y. (Tr. at 672.) Dr. Reid has a Ph.D. in epidemiology[16] from the University of Arizona in Tucson, where she completed her doctoral dissertation on smoking exposure and characteristics of abnormal colorectal polyps. (Tr. at 672-673.) Dr. Reid has spent her career in the field of cancer epidemiology and has published numerous articles concerning the relationship between cancer and exposure to smoke. (Tr. at 673-674.)

Dr. Reid testified that there is broad consensus in the scientific community that exposure to second-hand smoke is negative. (Tr. at 680.) The scientific community reached this consensus by the early 2000s. (Tr. at 681.) And to a reasonable degree of scientific certainty, there is no amount of exposure to second-hand smoke that is acceptable from a health perspective. (Tr. at 679, 681.) This is because the scientific community does not know what risk is conferred by second-hand smoke. (Tr. at 681.)

---

16 Epidemiologists study risk factors and their association with disease occurrences and prevalence. (Tr. at 685-686.)

Consequently, the assumption is that any exposure to the carcinogens in second-hand smoke confers some health risk, rendering any level of exposure unhealthy. (Tr. at 681, 686.) The medical defendants all also agreed that exposure to second-hand smoke poses a serious health risk. (Tr. at 275, 329, 358, 475, 577, 646; Yin Tr. at 96, 97.)

Dr. Reid further testified that the Surgeon General of the United States has concluded that there is an association between exposure to second-hand smoke and the aggravation of symptoms in people with restrictive airway disease. (Tr. at 677-678.) That is, exposure to second-hand smoke exacerbates the symptoms of small airway disease. (Tr. at 682-683.) Similarly, Dr. Canfield and Nurse Practitioner Fowler both testified that someone with small airway disease, such as Davidson, was more at risk from exposure to second-hand smoke than someone without the disease. (Tr. at 579, 650.)

### 3. Davidson's Exposure to Second-Hand Smoke at Elmira

Davidson is not a smoker. (Tr. at 42.) When he arrived at Elmira in 1999, smoking was permitted in the 1800-inmate prison, including in the cells, exercise yard, and field house. (Tr. at 42-44, 270, 282-283, 320, 573, 651.) Inmates, in fact, could possess unlimited quantities of tobacco products in their cells. (Tr. at 271-272; Defendants' Exhibit J.) By Davidson's estimation, 70-80% of the inmate population smoked. (Tr. at 43.) Guards also smoked. (Tr. at 44, 273.) Several of the defendants agreed that the inmate population is largely comprised of smokers and that many inmates and staff at Elmira smoked. (Tr. at 251-252, 269, 318, 574.)

Davidson was housed on the first floor "flats" in a single cell on I-Block, which

contained four tiers and 313 inmates. (Tr. at 185, 192-193, 257-258, 270, 283, 311, 320-321.) I-block was an "open" block in the sense that one could look up from the first floor "flats" and see each of the four tiers and the ceiling. (Tr. at 193, 257-258, 311.) The cells were back-to-back and faced windows; there were no windows in the cells themselves. (Tr. at 274, 283, 284.) Exhaust fans and windows aided air circulation, but the ventilation was fairly poor. (Tr. at 258, 274, 275.)

Davidson testified that many prisoners on I-block smoked, creating a "fog" throughout I-block that was impossible to avoid. (Tr. at 43-44, 193.) Bennett and Nurse Practitioner Fowler confirmed that smoke was visible in the air on I-block. (Tr. at 257, 274, 579.) In all, most witnesses asked, including Davidson, Bennett, West, and Smith, agreed that exposure to second-hand smoke at Elmira was constant and impossible to avoid.[17] (Tr. at 44, 85-86, 285, 322, 360.)

### 4. Implementation of the Smoke-Free Policy

In 1999, Elmira implemented a DOCCS-wide smoke-free policy that was distributed to all inmates. (Tr. at 58-59, 244-245, 247-249, 277; Plaintiff's Exhibit 6; Defendants' Exhibit J.) Bennett was the superintendent of Elmira at that time. (Tr. at 245-246, 252.) He testified that the policy was to be implemented in four phases: first, information was disseminated to inmates and staff; second, smoking was banned in all facilities other than the housing units; third, smoking in the housing units was limited to the cells; fourth, smoking was banned in all buildings. (Tr. at 61-62, 246, 248, 361;

---

17 West testified that whether an inmate was a smoker or a non-smoker was not a consideration when making cell or block assignments. (Tr. at 320, 334.) He conceded on cross-examination that it may have been technically possible (but not feasible) to determine which inmates smoked and which did not, and to then segregate the inmates into cells or blocks accordingly. (Tr. at 320-321.)

Defendants' Exhibit J.)   The policy also gradually reduced the quantities of cigarettes, cigars, and loose tobacco that prisoners could possess over the course of the four-phase implementation.   (Tr. at 59, 249-250; Defendants' Exhibit J.)   The goal of the policy was to prohibit smoking in all facility buildings by January 1, 2001.   (Tr. at 61-62.)   But smoking outdoors remained permitted.   (Tr. at 59, 246.)   Tobacco products therefore remained available for sale in the commissary, and prisoners were permitted to possess some quantities of cigarettes and tobacco products in their cells.   (Tr. at 252-253.)

Given the smoking culture of the inmate population, implementation of the program was very difficult.   (Tr. at 251-252, 269, 352, 690.)   The new policy was met with resistance from both inmates and staff.   (Tr. at 567.)   DOCCS offered inmates smoking-cessation and other programs to assist them in conforming to the new policy, yet smoking continued both during and after implementation, despite that both inmates and staff were subject to discipline for violating the policy.   (Tr. at 250-251, 254-255.)   Nicotine patches were also made available in the commissary.   (Tr. at 251, 308-309.)

Bennett testified that he tried to implement and enforce the smoke-free policy in good faith and that, in his opinion, smoking decreased because of the policy.   (Tr. at 256.)   For example, before implementation of the policy, Bennett observed that the housing units were full of smoke, but after implementation, there was rarely smoke visible in the housing units.   (Tr. at 256-257.)   Bennett conceded, however, that even after the policy was implemented, violations occurred and prisoners remained exposed to second-hand smoke.   (Tr. at 294, 296.)   He also conceded that he could have implemented a more restrictive no-smoking policy at Elmira like other DOCCS facilities had done.   (Tr.

at 289-290.)

Similar to Bennett, West testified about the implementation of the smoke-free policy, the efforts made to help inmates conform, and the difficulties securing compliance with the policy. (Tr. at 308-310.) He testified that staff at Elmira implemented the policy as best they could, yet he still encountered a few inmates smoking indoors after implementation, but not as many as he expected he would. (Tr. at 310, 324, 327.) He never encountered staff smoking indoors in violation of the policy. (Tr. at 311.) Nevertheless, he testified that inmates, including Davidson, were still exposed to second-hand smoke after implementation of the policy. (Tr. at 329.)

Drs. Yin, Desai, Canfield, and Nurse Practitioner Fowler all testified that they had no role in the implementation or enforcement of the smoke-free policy, other than to perhaps enforce the policy in the infirmary, if necessary. (Tr. at 458, 567, 575-576, 636-637; Yin Tr. at 74.)

Davidson testified that the smoke-free policy, even after full implementation, had no effect on smoking at Elmira. (Tr. at 62.) He experienced no change in smoke levels, and he testified that "prisoners and guards continued to smoke with abandon," causing continued exposure to second-hand smoke. (Tr. at 62, 63, 67.) Davidson further testified that the smoke-free policy was never successfully implemented and that smoking continued regardless of the policy. (Tr. at 63, 67.) Nurse Practitioner Fowler also testified that there were no changes inside the housing blocks after implementation of the smoking ban. (Tr. at 568.)

### 5. Davidson's Request to be Housed in the Infirmary

Davidson testified that the only places where there was no smoking at Elmira were the mess hall, the infirmary, and possibly the chapel.   (Tr. at 44.)   In Davidson's view, therefore, the only way he could avoid exposure to second-hand smoke was to be housed in the infirmary, which he repeatedly requested of Defendants Desai, Yin, Bennett, West, and Smith.[18]   (Tr. at 45, 47, 54, 69-70, 72-74, 196, 476; Yin Tr. at 103.)   Davidson's requests for infirmary placement, however, were repeatedly denied, which left him frustrated and aggravated because he was afraid of developing lung cancer.   (Tr. at 54, 58, 67, 69, 70, 73.)

Davidson testified that the infirmary was a smoke-free area: no prisoners, guards, or medical staff were permitted to smoke there.   (Tr. at 44, 69.)   Defendants Yin, Desai, Canfield, Fowler, and Bennett also testified that smoking was prohibited in the medical offices and infirmary.   (Tr. at 283, 476, 572, 580, 644-646; Yin Tr. at 101, 103, 104.)

Davidson testified that inmate housing in the infirmary was possible and that the infirmary was often used for non-medical-related housing.   (Tr. at 70.)   For example, Davidson testified that the infirmary was used to house inmates traveling for funerals, deathbed visits, or court.   (Tr. at 71.)   He also stated that it was used for administrative segregation.   (Tr. at 71.)

Nurse Practitioner Fowler testified about the statewide DOCCS policy concerning infirmary admissions.   (Tr. at 569; Defendants' Exhibit T.)   According to that policy, "[i]nfirmary admission [was] appropriate for patients with an injury or illness requiring

---

18 Neither Dr. Yin nor Dr. Desai recalled Davidson ever asking to be housed in the infirmary.   (Tr. at 487-488; Yin Tr. at 103.)

continuous nursing observation, management or intervention, but not needing the services of an acute care hospital."   (Tr. at 570; Defendants' Exhibit T.)

Nurse Practitioner Fowler's understanding was that only inmates requiring medical attention that could not be provided in the cell block could be admitted to the infirmary, which consisted of approximately 28 beds.   (Tr. at 568.)   This was Dr. Canfield's understanding as well.   (Tr. at 636.)   Fowler testified that inmates were admitted to the infirmary for only medical reasons, and that he could not recall any non-medical-related admissions to the infirmary, such as for attending funerals or other temporary placement. (Tr. at 581-582.)

Drs. Yin and Canfield each testified that the security staff made housing decisions and that medical staff could only recommend that an inmate stay in the infirmary while being treated.   (Tr. at 637; Yin Tr. at 73, 104-105.)   Dr. Yin estimated that there were 24 beds in the infirmary, all of which were used for patients who needed urgent care or had difficulty ambulating.   (Yin Tr. at 74.)   He further testified that Davidson never presented with any medical condition that required infirmary placement.   (Yin Tr. at 73-74.)   Drs. Desai and Canfield also testified that Davidson never showed any signs that he needed to be housed in the infirmary.   (Tr. at 459, 636.)

Defendants Bennett, West, and Smith each testified that the medical department determined whether an inmate needed to be housed in the infirmary and that they generally deferred to those determinations.   (Tr. at 258, 312-313, 329-330, 353.) Bennett testified that only inmates who were ill or required medical attention were placed in the infirmary, though he conceded that nothing technically prevented him from allowing

inmates to be housed in the infirmary to avoid second-hand smoke.   (Tr. at 259, 294.)

## IV.    CONCLUSIONS OF LAW

### A.  42 U.S.C. § 1983 and Personal Involvement

Davidson brings each of his claims under 42 U.S.C. § 1983.   Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983.   To succeed on a § 1983 claim, a plaintiff must establish that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."   Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); see also Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983.   See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999).   It is well settled in this circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.   See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in

managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also

Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Personal involvement need not be

active participation. It can be found "when an official has actual or constructive notice of

unconstitutional practices and demonstrates gross negligence or deliberate indifference

by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

Thus, personal involvement can be established by showing that

> (1) the defendant participated directly in the alleged
> constitutional violation; (2) the defendant, after being
> informed of the violation through a report or appeal, failed to
> remedy the wrong; (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom; (4) the
> defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts; or (5) the defendant
> exhibited deliberate indifference to others' rights by failing to
> act on information indicating that constitutional acts were
> occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58

F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d

Cir. 2003).

## B. Eighth Amendment Denial of Medical Treatment

The Eighth Amendment, which applies to the States through the Fourteenth

Amendment, "prohibits the infliction of 'cruel and unusual punishments' on those

convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 111 S. Ct. 2321, 115 L. Ed.

2d 271 (1991); U.S. Const. amend. VIII. As such, prison conditions and the treatment

prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment.

See DeShaney v. Winnebago County Dep't of Social Svcs., 489 U.S. 189, 199-200, 109

S. Ct. 998, 103 L. Ed. 2d 249 (1989).

The United States Supreme Court has recognized that a prisoner's claim that he was denied medical treatment is cognizable under the Eighth Amendment through § 1983:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

Estelle v. Gamble, 429 U.S. 97, 104, 106, 97 S. Ct. 285, 50 L. Ed. 2d 25 (1976) (quotations and citations omitted).

But "not every lapse in prison medical care will rise to the level of a constitutional violation." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). Rather, an Eighth Amendment violation occurs only when two requirements—one objective, one subjective—are met.

### 1. The Objective Requirement

The first requirement is that the deprivation of medical care be objectively "sufficiently serious." Wilson, 501 U.S. at 298. That determination in turn requires a two-fold inquiry: first, whether the prisoner was actually deprived of adequate medical care, and if so, whether the inadequacy in medical care was sufficiently serious. See Salahuddin, 467 F.3d at 279-280.

On the first question, the Supreme Court has determined that prison officials' duty is limited to providing only reasonable care. See Farmer v. Brennan, 511 U.S. 825, 844-47, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Consequently, "prison officials who act reasonably in response to an inmate-health risk cannot be found liable and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." Salahuddin, 467 F.3d at 279-280 (quotations and citations omitted).

On the second question, "the court [must] examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280.

If the claim is that prison officials failed to provide any treatment at all for an inmate's medical condition, courts examine whether the inmate's untreated medical condition is sufficiently serious. Id. (citing Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003)). In this regard, more than minor discomfort or injury is required to demonstrate a serious medical condition implicating the Eighth Amendment. See Evering v. Rielly, No. 98 CIV. 6718, 2001 WL 1150318, *9 (S.D.N.Y. Sept. 28, 2001). Factors relevant to the inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citations omitted)). In the end, the medical condition must be "sufficiently serious, in the sense that a condition

of urgency, one that may produce death, degeneration, or extreme pain exists."
Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996); see also Chance, 143 F.3d at
702; Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998).

If the claim is that prison officials provided medical care that was inadequate, "the
seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. "For example, if the
prisoner is receiving on-going treatment and the offending conduct is an unreasonable
delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged
delay or interruption in treatment rather than the prisoner's underlying medical condition
alone.'" Id. (quoting Smith, 316 F.3d at 185.)

### 2. The Subjective Requirement

The second requirement is that the prison official must act with a sufficiently
culpable state of mind. A plaintiff must prove that the defendant acted with deliberate
indifference. See Wilson, 501 U.S. at 302. That is, the defendant must have acted or
failed to act "while actually aware of a substantial risk that serious inmate harm will result."
Salahuddin, 467 F.3d at 280. As the Second Circuit has explained: "[t]he reckless official
need not desire to cause such harm or be aware that such harm will surely or almost
certainly result. Rather, proof of awareness of a substantial risk of the harm suffices."
Id. (citing Farmer, 511 U.S. at 835, 842). But the risk of harm must be substantial and
the official's actions more than merely negligent. Id. Medical malpractice and
negligence, for example, are not actionable under § 1983. See Salahuddin, 467 F.3d at
280. Nor is the denial of a preferred course of treatment or disagreement over proper

51

treatment. See, e.g., Chance, 143 F.3d at 703 ("it is well-established that mere disagreement over the proper treatment does not create a constitutional claim . . . [s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) (noting that a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated").

Importantly, "the charged official must be subjectively aware that his conduct creates [a risk of harm]." Salahuddin, 467 F.3d at 281 (citing Farmer, 511 U.S. at 837). A "defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere . . . Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 281.

## C. First Amendment Retaliation

It is well established that prison officials cannot retaliate against inmates for exercising their constitutional rights. See Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002); Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988). In particular, it is well established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under [42 U.S.C.] § 1983." Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996).

To succeed on a First Amendment retaliation claim, the plaintiff must prove "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse

action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015) (quoting Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009)); see also Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).

As to the first requirement, it is well settled that an inmate's pursuit of a grievance constitutes protected activity. See Graham, 89 F.3d at 80.

For purposes of the second requirement, adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Gill v. Pidlypchack, 389 F.3d 379, 380 (2d Cir. 2004) (citing Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)). "If the action would not deter an individual of ordinary firmness the retaliatory act 'is simply de minimis and therefore outside the ambit of constitutional protection.'" Islam v. Goord, No. 05 Civ. 7502, 2006 WL 2819651, at *4 (S.D.N.Y. Sept. 29, 2006) (citing Davis, 320 F.3d at 353 (2d Cir. 2003)).

As to the third requirement, the plaintiff must show that "the protected conduct was a substantial or motivating factor" for the defendant's action. See Graham, 89 F.3d at 79. To determine whether a causal connection exists between the inmate's protected activity and the defendant's action, courts examine a number of factors, including "[1] the temporal proximity between the protected activity and the alleged retaliatory act; [2] the inmate's prior good disciplinary record; [3] vindication at a hearing on the matter; and [4] statements by the defendant concerning his or her motivation." Baskerville v. Blot, 224

F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." Id.

But even if the plaintiff makes this showing, the defendant may avoid liability if he demonstrates that the same action would have been taken against the plaintiff absent the retaliatory motivation. Graham, 89 F.3d at 79-80; Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may [avoid liability] if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.").

In conducting this analysis, the Second Circuit has cautioned district courts to view prisoners' retaliation claims with "skepticism and particular care," because of the ease and frequency with which they are fabricated. See Colon, 58 F.3d at 872; Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983); Arce v. Walker, 58 F. Supp. 2d 39, 46 (W.D.N.Y. 1999). Such skepticism is warranted "because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001), overruled on other grounds by, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

**D. Eighth Amendment Exposure to Second-Hand Smoke**

As noted, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment. See DeShaney, 489 U.S. 189,

199-200.   This is because "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being."   Id.; see also Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) (noting that it is "cruel and unusual punishment to hold convicted criminals in unsafe conditions").

In 1993, the Supreme Court recognized that a prisoner's claim that he was exposed to levels of second-hand smoke that pose an unreasonable risk of serious damage to his future health is cognizable under the Eighth Amendment through § 1983. See Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993).

To prove such a claim, the plaintiff must satisfy both objective and subjective components.   See Warren v. Keane, 196 F.3d 330, 333 (2d Cir. 1999.)   On the objective component, the plaintiff "must show that he himself is being exposed to unreasonably high levels of [second-hand smoke]."   Helling, 509 U.S. at 35.   He must also show that "the risk of which he complains is not one that today's society chooses to tolerate" as follows:

> [D]etermining whether [the plaintiff's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [second-hand smoke]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.

Id. at 36 (emphasis in original).

On the subjective component, the plaintiff must prove that the defendant was deliberately indifferent to the risks posed by second-hand smoke. Id. That is, the plaintiff must prove that the defendant acted or failed to act "while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280. In this regard, the defendant's "current attitudes and conduct" must be assessed, including whether a smoking policy has been implemented, which "will bear heavily on the inquiry into deliberate indifference." Helling, 509 U.S. at 36. The "realities of prison administration" must also be considered in assessing the defendant's actions. Id. "As long as reasonable efforts are made, 'imperfect enforcement of [a no-smoking policy] alone may not support a finding of deliberate indifference.'" Klein v. Fischer, No. 9:13-CV-437 (BKS/TWD), 2015 WL 5174031, at * (N.D.N.Y. Sept. 2, 2015) (citing Enigwe v. Zenk, No. 03-CV-854 (CBA), 2007 WL 1997709, at *6 (E.D.N.Y. Sept. 14, 2007)).

## V.     ANALYSIS

### A. Davidson's First Claim (Shoulder)

Davidson's claim concerning his shoulder has two components. First, Davidson maintains that Defendants Desai, Yin, and Fowler were deliberately indifferent to his shoulder condition when they canceled his December 2000 shoulder surgery and then refused to re-schedule it, instead directing that he undergo more conservative treatment, which Davidson maintains resulted in further deterioration of his shoulder and additional pain and suffering. Second, Davidson maintains that Defendants Yin, Bennett, West, and Canfield canceled his December 2000 shoulder surgery in retaliation for him filing

grievances.

**1. Davidson failed to prove by a preponderance of the evidence that Defendants Desai, Yin, and Fowler were deliberately indifferent to his shoulder condition when they canceled his December 2000 shoulder surgery and then refused to re-schedule it.**

As noted above, Davidson must prove by a preponderance of the evidence that Defendants Desai, Yin, and Fowler engaged in a "sufficiently serious" deprivation of medical care and that they acted with deliberate indifference in doing so. See Wilson, 501 U.S. at 298, 302. This he did not do.

As an initial matter, Davidson did not prove that any of these named defendants canceled his December 2000 shoulder surgery. Rather, the preponderance of the evidence demonstrates that Dr. Mosher canceled the surgery. Nurse Practitioner Fowler testified that the medical department at Elmira was informed by Dr. Mosher's office that Dr. Mosher had canceled the December 15, 2000. (Tr. at 537-538.) Unrebutted written documentation also indicates that "Dr. Mosher at this point is opting not to proceed w/the scheduled surgery for tomorrow." (Defendants' Exhibit B-882.) Davidson presented no evidence that anyone other than Dr. Mosher canceled his December 2000 surgery. (Tr. at 204.) Consequently, to the extent Davidson maintains that the cancellation of his December 2000 surgery standing alone violates his Eighth Amendment rights, he failed to prove that Defendants Desai, Yin, or Fowler were personally involved in that deprivation. See Haygood, 64 F. Supp. 2d at 280 (describing personal involvement as the *sine qua non* of liability under § 1983).

Turning to the re-scheduling of the surgery, Davidson contends that the named

57

defendants' failure to re-schedule his surgery violated his Eighth Amendment rights. To be clear, Davidson does not allege that the named defendants entirely failed to treat his shoulder condition.[19] Rather, his claim is that the treatment provided was inadequate because the named defendants failed to reschedule his surgery. See Salahuddin, 467 F.3d at 280

On the objective component, this Court finds that Davidson failed to prove by a preponderance of the evidence that the failure to reschedule his surgery was sufficiently serious. Rather, the evidence at trial demonstrates that the decision to pursue a more conservative path of treatment was reasonable. See Farmer, 511 U.S. at 844-47 (finding that prison officials need only provide reasonable care). First, among the orthopedic surgeons who examined Davidson, Dr. Mosher's position that surgery was warranted was the minority view: both Dr. Kaemppfe and Dr. Webster found that surgery was not medically indicated. (Tr. at 90-91, 610-611; Yin Tr. at 17, 18, 31, 41-42, 70; Defendants' Exhibit B-442, B-949, B-1204.) Second, an X-ray performed after Dr. Mosher canceled the surgery was normal, and Davidson found some relief from steroid shots that were administered. (Tr. at 610; Yin Tr. at 41, 42, 70; Defendants' Exhibits B-949, B-1204.) Thus, the continuation of a more conservative course of treatment was yielding results. The named defendants' decision to pursue this path of treatment was therefore reasonable. See Salahuddin, 467 F.3d at 279-280 (noting that prison officials who

---

19 Indeed, this Court intentionally included expanded findings of fact to demonstrate just how exhaustive the medical care was that Davidson received at Elmira.

provide reasonable care cannot be found liable).

Moreover, Davidson failed to prove by a preponderance of the evidence that he suffered any significant harm by not having his surgery rescheduled. Davidson complains that he continued to suffer pain in his left shoulder, but evidence in the record reveals that he found some relief through steroid shots, and in addition, Davidson was prescribed a number of pain medications. Although these pain medications were prescribed for his back, Dr. Desai testified that pain medication prescribed for one area of the body will treat pain emanating from all other areas of the body. (Tr. at 431.)

For this reason, this Court finds Davidson's complaints of debilitating pain to be less than credible. (Tr. at 120-121, 127.) For example, Davidson testified that his pain levels in Fall 2000 were at their lowest a 7 or an 8 on a 10-point scale. (Tr. at 127.) Yet at that time, Davidson was on Darvocet and was not taking the medication regularly. (Tr. at 440-441.) In October 2000, for example, Davidson reported to the infirmary to take Darvocet only eight times. (Tr. at 448-449.) As a result, Dr. Desai decreased Davidson's Darvocet to an "as needed" basis and viewed his decreased consumption of pain medication as a good sign indicative of his pain resolving to a point of no pain or tolerable pain. (Tr. at 448-449.) This Court therefore finds Davidson's complaints of constant debilitating pain day and night, whether active or motionless (Tr. at 120-121) to be overstated given the evidence that Davidson was prescribed a number of different pain medications while at Elmira, some of which he elected to use only intermittently.

On the subjective component, Davidson wholly failed to prove by a preponderance

of the evidence that the named defendants acted with deliberate indifference. Even assuming that the failure to reschedule Davidson's shoulder surgery caused him harm, which this Court finds that it did not, Davidson presented no evidence that the named defendants knew that failing to reschedule the surgery in favor of a conservative course of treatment posed a substantial risk to Davidson's health and deliberately chose to follow that course regardless. See Salahuddin, 467 F.3d at 280. Based on the evidence of the named defendants' dogged efforts to resolve and treat Davidson's shoulder pain, this Court finds by a preponderance of the evidence that they sincerely believed that a conservative course of treatment was both medically indicated and in Davidson's best interest. They therefore did not act with deliberate indifference.[20]

For these reasons, this Court finds that Davidson failed to prove by a preponderance of the evidence that Defendants Desai, Yin, or Fowler were deliberately indifferent to his shoulder condition by cancelling his December 2000 shoulder surgery and failing to reschedule it.

**2. Davidson failed to prove by a preponderance of the evidence that Defendants Yin, Bennett, West, and Canfield canceled his December 2000 shoulder surgery in retaliation for him filing grievances.**

To prove his First Amendment claim, Davidson must prove by a preponderance of the evidence that Defendants Yin, Bennett, West, and Canfield canceled his December 2000 surgery because he filed grievances against one or more of them. See Dolan, 794

---

[20] The named defendants' refusal to accede to Davidson's preferred treatment (surgery), of course, does not give rise to an Eighth Amendment violation. See Chance, 143 F.3d at 703 ("mere disagreement over the proper treatment does not create a constitutional claim").

60

F.3d at 294.   This claim fails for several reasons.

First, as found above, the preponderance of the evidence demonstrates that Dr. Mosher—and nobody but Dr. Mosher—canceled Davidson's December 2000 surgery. Other than his own accusations (Tr. at 151-154), Davidson presented no evidence whatsoever from which it could be concluded that Defendants Yin, Bennett, West, or Canfield were involved in any way with the cancellation of his surgery.   Davidson therefore failed to prove personal involvement.   See Haygood, 64 F. Supp. 2d at 280.

Second, Davidson failed to sufficiently prove that he filed grievances against Defendants Yin, Bennett, West, or Canfield in or about December 2000.   Rather, he simply testified that he had filed grievances against each defendant "on occasion."   (Tr. at 151-152.)   He did not identify dates; he did not identify subject matter; he did not relate outcomes.   And he failed to introduce any grievances at all into evidence.   Thus, other than his bald testimony that he filed grievances against the named defendants "on occasion" and they were collectively angered by them (Tr. at 153-154), there is insufficient evidence that Davidson engaged in protected activity in or about December 2000, when his surgery was canceled.   See Dolan, 794 F.3d at 294.

Third, for the same reasons Davidson failed to prove personal involvement, he failed to prove that the named defendants took an adverse action against him.   The alleged adverse action is the cancellation of the December 2000 surgery, but as indicated, Davidson failed to prove by a preponderance of the evidence that any of the named defendants canceled that surgery.

Finally, because Davidson failed to prove that he engaged in protected activity and failed to introduce any evidence concerning the timing of any grievances, he necessarily failed to prove a causal connection between his filing of grievances and the cancellation of his surgery. See id. And neither of the incidents Davidson relies on as evidence of retaliation—Nurse Practitioner Fowler asking him "who won?" in regard to the November 2000 surgery and Dr. Canfield's email to Dr. Koii in December 2004—relate to the cancellation of Davidson's December 2000 surgery. (Tr. at 110, 154, 648-652.)

For these reasons, this Court finds that Davidson failed to prove by a preponderance of the evidence that Defendants Yin, Bennett, West, or Canfield canceled his December 2000 shoulder surgery in retaliation for him filing grievances against them.

## B. Davidson's Second Claim (Back)

Davidson's second claim has three components. First, Davidson maintains that Defendants Desai, Yin, and Fowler were deliberately indifferent to his serious back pain by allowing his pain medication prescription to lapse on May 23, 2001. Second, Davidson maintains that these same defendants abruptly discontinued his methadone medication in March 2002, which caused him to suffer withdrawal symptoms. Third, Davidson maintains that he was denied pain medication on certain dates in January and February 2002.

**1. Davidson failed to prove by a preponderance of the evidence that Defendants Desai, Yin, and Fowler were deliberately indifferent to his serious back pain by allowing his methadone prescription to lapse on May 23, 2001.**

To succeed on this claim, Davidson must prove by a preponderance of the

evidence that Defendants Desai, Yin, and Fowler engaged in a "sufficiently serious" deprivation of medical care and that they acted with deliberate indifference in doing so. See Wilson, 501 U.S. at 298, 302.   Although this Court finds that Davidson proved by a preponderance of the evidence that his methadone prescription was not renewed on May 23, 2001, it further finds that Davidson failed to prove that this amounted to a violation of his Eight Amendment rights.

Davidson established by a preponderance of the evidence that he requested that his methadone prescription be renewed on May 23, 2001.   (Yin Tr. at 120; Defendants' Exhibit B-222.)   He further established that his request was never acted upon, as evidenced by the lack of an order in the ambulatory health record.   (Yin Tr. at 121.)   It was not until June 25, 2001, that his methadone prescription was renewed.   (Yin Tr. at 53, 54; Defendants' Exhibit B-228.)

What Davidson fails to prove by a preponderance of the evidence, however, is that this deprivation was sufficiently serious or that the named defendants acted with deliberate indifference in failing to renew his prescription.

This deprivation was not sufficiently serious because just one month before, Davidson's methadone prescription was decreased to an "as needed" basis and Davidson was not taking it regularly.   (Tr. at 544, 594-595; Yin Tr. at 49; Defendants' Exhibits B-212, B-214.)   Moreover, there is no evidence that Davidson suffered any pain or withdrawal symptoms as a result of this deprivation.   Both Dr. Yin and Nurse Practitioner Fowler both testified that Davidson never presented with any withdrawal symptoms and

his medical records contain no notations of him ever suffering withdrawal symptoms. (Tr. at 594; Yin Tr. at 119.) And given the frequency with which Davidson sought medical treatment and attention, it is reasonable to assume that he would have reported to the medical department if he was experiencing sufficiently serious pain. Finally, Davidson did not establish that his untreated back pain constituted "a condition of urgency, one that may produce death, degeneration, or extreme pain." See Hathaway, 99 F.3d at 553.

But even if this deprivation could be found to be sufficiently serious, there is a total absence in the record of any evidence suggesting that the named defendants intentionally failed to act or failed to act while aware of a substantial risk that Davidson could be seriously harmed by the failure to renew his methadone prescription. See Salahuddin, 467 F.3d at 280. To the contrary, the record is replete with evidence that the medical defendants repeatedly refilled Davidson's pain medications when requested. Their failure to renew his prescription on May 23, 2001, thus appears to have simply been an oversight, or, at worst, non-actionable negligence or malpractice. Id. Davidson thus failed to prove by a preponderance that the named defendants acted with deliberate indifference.

Consequently, this Court finds that Davidson failed to prove by a preponderance of the evidence that Defendants Desai, Yin, and Fowler were deliberately indifferent to his serious back pain by allowing his methadone prescription to lapse on May 23, 2001.

**2. Davidson failed to prove by a preponderance of the evidence that Defendants Desai, Yin, and Fowler abruptly discontinued his methadone medication in March 2002.**

Davidson claims that Defendants Desai, Yin, and Fowler violated his Eighth Amendment rights when they abruptly discontinued his methadone medication for six months beginning in March 2002, when the medical-bedrest policy was implemented. (Tr. at 166-169, 188-189.)   The proof at trial, however, demonstrated that Davidson himself voluntarily elected to discontinue methadone to avoid the strictures of the new medical-bedrest policy.   (Tr. at 188-189; 555-556.)   Tellingly, Davidson requested that his methadone be reinstated in September 2002, when the medical-bedrest policy was discontinued.   (Tr. at 170, 606-607, 658-659; Defendants' Exhibit B-320.)   Put simply, Davidson presented no evidence whatsoever that any of the defendants named in this claim ever discontinued his methadone for a six-month period.   This claim therefore fails on the facts and for lack of personal involvement by the named defendants.   See Haygood, 64 F. Supp. 2d at 280.

**3. Davidson did not prove by a preponderance of the evidence that any named defendant denied him pain medication in January or February 2002.**

Davidson claims that he was denied pain medication in violation of his Eighth Amendment rights on January 13-15 and February 13-18, 2002.   (Tr. at 165, 177-178.) At trial, however, Davidson testified that he was denied pain medication on these dates by registered nurses who worked in the medical department at Elmira, none of whom are named as defendants in this case.   (Tr. at 177-179.)    Davidson presented no evidence

in any form that the defendants named in this action ever denied him pain medication, as alleged. Like the one before it, this claim thus fails on the facts and for lack of personal involvement by the defendants. See Haygood, 64 F. Supp. 2d at 280.

## C. Davidson's Third Claim (Allergies/Asthma)

Davidson's third claim is that Defendants Desai, Yin, Bennett, West, and Smith were deliberately indifferent to his allergy and asthma conditions by exposing him to second-hand smoke.

To succeed on this claim, Davidson must show both that he was exposed to unreasonably high levels of second-hand smoke and that the defendant was deliberately indifferent to the risks posed by second-hand smoke. See Warren, 196 F.3d at 333.

As to the first inquiry, this Court finds that Davidson failed to prove by a preponderance of the evidence that he was exposed to unreasonably high levels of second-hand smoke that posed an unreasonable risk to his present or future health. See id. This inquiry requires an individualized assessment of Davidson's exposure to second-hand smoke: "[t[he inquiry under Helling is not whether [second-hand smoke] exposure is generally harmful, or whether it has been shown to cause increased risks in populations exposed to it; the inquiry is whether *Plaintiff's* particular exposure to [second-hand smoke] caused him to suffer a greater risk of harm." Klein, 2015 WL 5174031, at *22 (emphasis added). As a result, "[g]eneral studies, medical journals and statistics are not sufficient to make the individualized showing of risk that is required." Durham v. Lappin, No. 05-cv-1282-MSK-KLM, 2010 WL 918066, at *5 (D. Colo. Mar. 11, 2010).

Davidson sufficiently proved that he was subject to *some* exposure to second-hand smoke. That exposure consisted primarily of the ambient air in I-block, where most of the 313 inmates smoked and a visible fog hung in the air, though Davidson failed to prove by a preponderance of the evidence that this fog was present within the statute of limitations period after implementation of the no-smoking policy. In any event, Davidson (a non-smoker) was housed in a single cell, not with any smokers. And he was housed on the first floor of I-block, which allowed smoke to rise above him. In addition, I-block had windows and exhaust fans, though the evidence of their effectiveness was mixed. Finally, for the entirety of the statute of limitations period, Elmira was subject to a no-smoking policy, which reduced, but did not eliminate, smoking.

Based on this limited evidence of exposure, this Court finds that Davidson failed to prove by a preponderance of the evidence that he was exposed to unreasonably high levels of second-hand smoke.[21] See Helling, 509 U.S. at 28 (inmate housed with cellmate who smoked five packs of cigarettes per day); Warren, 937 F. Supp. at 303 (smoke so thick that inmates had to hold wet handkerchiefs over their noses and mouths); Ward v. LeClaire, Civ. No. 907-CV-26 (GTS/RFT), 2009 WL 6302822, at *3-4 (N.D.N.Y. Sept. 16, 2009) (47 out of 60 inmates in the plaintiff's housing unit smoked). "Courts have generally found [second-hand smoke] exposure to be unreasonably high mainly

---

[21] This Court notes that Davidson's previous second-hand-smoke claim against prison officials at the Auburn Correctional facility similarly failed on this ground. See Davidson v. Coughlin, 920 F. Supp. 305, 309 (N.D.N.Y. 1996) ("Whereas plaintiff in Helling had been housed in a cell with an inmate who smoked five packs of cigarettes per day, plaintiff in this case was housed in his own individual cell and has not demonstrated exposure to levels of [second-hand smoke] comparable to those in Helling.")

when the plaintiff shares a cell with an inmate who is a frequent or chain smoker, or when the plaintiff is housed in a cell surrounded by such smokers," neither of which Davidson proved by a preponderance of the evidence. Eldridge v. Williams, No. 10 Civ. 423 (LTS), 2013 WL 4005499, at *8 (S.D.N.Y. July 20, 2013). In this Court's view, the trial evidence established that Davidson's exposure to second-hand smoke within the statute of limitations period was not egregious and not "so grave that it violate[d] contemporary standards of decency to expose *anyone* unwillingly to such risk." Helling, 509 U.S. at 36 (emphasis in original). Indeed, the majority of Davidson's actionable exposure to second-hand smoke occurred *after* implementation of the no-smoking policy.

Davidson also failed to prove by a preponderance of the evidence that his exposure to second-hand smoke caused or exacerbated a sufficiently serious medical condition. Davidson arrived at Elmira with allergies and was subsequently diagnosed with small airway or obstructive airway disease and eventually with asthma after he left Elmira. The trial evidence established that Davidson's exposure to second-hand smoke increased his symptoms from these medical conditions, but Davidson failed to prove that his respiratory conditions, even when exacerbated by exposure to second-hand smoke, were sufficiently serious. At worst, the evidence established that Davidson had mild respiratory issues that were treated with allergy shots and an Albuterol inhaler. Mild, non-life threatening respiratory conditions that do not require hospitalization are generally insufficiently serious for Eighth Amendment purposes. See Eldridge, 2013 WL 4005499, at *10 (citing Oliver v. Deen, 77 F.3d 156, 158-60 (7th Cir. 1996)); see also Johnson v.

Goord, No. 01 Civ. 9587, 2005 WL 2811776, at *5-6 (S.D.N.Y. Oct. 27, 2005) (plaintiff's temporary discomfort and occasional treatment for respiratory conditions not sufficiently serious); Gill v. Bracey, 99 Civ. 10429, 2001 WL 34045758, at *4 (S.D.N.Y. July 17, 2001) (plaintiff's treatable infection and respiratory problems such as asthmatic bronchitis not sufficiently serious); Blyden v. Bartlett, No. 95 Civ. 1071, 1997 WL 584308, at *2 (W.D.N.Y. Sept. 9, 1997) (plaintiff's headaches, irritability, and nausea not sufficiently serious and no medical records substantiated causation or aggravation of allergies due to exposure to second-hand smoke).    Davidson therefore failed to prove the objective element of his claim.[22]

Davidson also failed to prove the subjective element of his claim: that the named defendants were deliberately indifferent to the risks posed by second-hand smoke.    See Warren, 196 F.3d at 333.    Important here, the implementation of a smoking policy weighs heavily against a finding of deliberate indifference.    See Helling, 509 U.S. at 36.    The evidence at trial established that the defendants implemented the DOCCS-wide no-smoking policy at Elmira.    Although the no-smoking policy was met with resistance and non-compliance by some inmates and staff, the evidence at trial established that defendants implemented the policy in good faith and worked to enforce it.    Inmates and staff alike were subject to discipline for violating the no-smoking policy and smoking-cessation and other programs were offered to assist in compliance with the policy.

---

22 Due to his failure to prove exposure to unreasonably high levels of second-hand smoke, Davidson also necessarily failed to prove any claim based on future harm, such as developing lung cancer.    See Helling, 509 U.S. at 35.

These measures reduced smoking, though they did not eliminate it.

Elimination of smoking in its entirety, however, is not required; Helling does not mandate smoke-free prisons. See Taylor v. Conway, No. 06-CV-1329 (SDU), 2008 WL 4371928, at *4 (D. Conn. Sept. 23, 2008) ("All exposure to [second-hand smoke] is not unconstitutional; only exposure to an unreasonably high level of [second-hand smoke] is cognizable as a constitutional violation."). Consequently, so long as prison officials make reasonable efforts at enforcing a smoking policy, as the defendants did here, deliberate indifference cannot be found. See Enigwe, 2007 WL 1997709, at *6; see also Klein, 2015 WL 5174031, at *26 (granting summary judgment where the defendant established that although enforcement of the smoking policy was not perfect, he made reasonable efforts at enforcement and thus had not been deliberately indifferent to the plaintiff's alleged exposure to second-hand smoke); Eldridge, 2013 WL 4005499, at *12 ("mere imperfect enforcement of an indoor smoking ban in a prison, as long as reasonable enforcement efforts are made, does not amount to deliberate indifference") (citing Scott v. Dist. of Columbia, 139 F.3d 940, 944 (D.C. Cir. 1998)).

Notwithstanding the defendants' implementation and enforcement of the no-smoking policy, Davidson maintains that they were deliberately indifferent because they repeatedly refused his requests to be housed in the smoke-free infirmary. Other than his own belief that such housing would be appropriate, Davidson presented no evidence that permanent housing in the infirmary to avoid second-hand smoke was available or reasonable. To the contrary, each defendant that testified on the subject stated that the

infirmary admission policy permitted housing in the infirmary only for those inmates who had a medical need that could not be attended to in their cells. And each doctor that treated Davidson testified that he never presented with any condition, related to exposure to second-hand smoke or otherwise, that required admission to the infirmary. Put simply, "the realities of prison administration" precluded Davidson's permanent housing in the infirmary.[23] Helling, 509 U.S. at 37. Consequently, the defendants' refusal to house Davidson in the infirmary does not constitute deliberate indifference.[24]

Accordingly, this Court finds that Davidson failed to prove by a preponderance of the evidence that Defendants Desai, Yin, and Fowler were deliberately indifferent to his allergy and asthma conditions by exposing him to second-hand smoke.

## VI.   CONCLUSION

For the foregoing reasons, this Court finds no cause of action for relief and each named defendant is entitled to judgment in his or her favor.

## VII.   ORDERS

IT HEREBY IS ORDERED, that there is NO CAUSE OF ACTION for relief.

FURTHER, that each defendant is entitled to judgment in his or her favor.

---

[23] "The realities of prison administration" would also preclude Davidson's undeveloped assertion that the defendants could have separated smoking and non-smoking inmates into different housing blocks, a point that Defendant West reluctantly testified may have been technically possible. In any event, Davidson did not prove by a preponderance of the evidence that such an arrangement was available or reasonable at the time he was incarcerated at Elmira.

[24] Davidson's claim that he should have been permanently housed in the infirmary to avoid exposure to second-hand smoke is particularly unreasonable given the trial evidence that there were only 24 to 28 beds in the infirmary for a population of approximately 1800 inmates.

FURTHER, that the Clerk of Court is directed to enter judgment and then close this

case.

SO ORDERED.

Dated:          January 8, 2019
                Buffalo, New York


                                              /s/William M. Skretny
                                              WILLIAM M. SKRETNY
                                           United States District Judge

# Appendix

| Objection Timestamp[25] | Party | Grounds | Ruling |
|---|---|---|---|
| 10:11:55 | Plaintiff | Relevance | Overruled |
| 10:12:02 | Plaintiff | Relevance | Overruled |
| 10:16:03 | Plaintiff | Relevance | Overruled |
| 10:26:10 | Plaintiff | Relevance | Overruled |
| 10:27:59 | Plaintiff | Relevance | Overruled |
| 10:29:56 | Plaintiff | Relevance | Overruled |
| 10:32:47 | Plaintiff | Relevance | Overruled |
| 10:33:25 | Plaintiff | Relevance | Overruled |
| 11:02:43 | Plaintiff | None stated | Overruled |
| 11:10:28 | Plaintiff | Relevance | Overruled |
| 11:10:47 | Plaintiff | Speculation | Overruled |
| 11:11:49 | Plaintiff | Speculation | Sustained as speculative and non-responsive |
| 11:29:13 | Plaintiff | Relevance | Overruled |
| 11:35:10 | Plaintiff | Non-responsive | Sustained as non-responsive |
| 11:36:49 | Plaintiff | Form | Overruled |
| 12:38:50 | Defendants | None stated | Overruled |
| 12:39:12 | Defendants | None stated | Sustained as calling for speculation |
| 12:40:10 | Defendants | None stated | Sustained as calling for speculation |
| 12:41:03 | Defendants | None stated | Overruled |
| 13:00:01 | Defendants | None stated | Overruled |
| 13:00:54 | Defendants | None stated | Overruled |
| 13:01:16 | Defendants | None stated | Overruled |
| 13:20:15 | Defendants | None stated | Overruled |
| 13:20:34 | Defendants | None stated | Overruled |
| 13:21:38 | Defendants | None stated | Overruled |
| 13:23:14 | Defendants | None stated | Overruled |
| 13:25:58 | Defendants | None stated | Overruled |

---

25  As set forth in Court Exhibit 1.